IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

REMBRANDT SOCIAL MEDIA, LP,  )
    Plaintiff,  )
      )
      )
    v.  )      Case No. 1:13cv158
      )
FACEBOOK, INC., et al.,  )
    Defendants.  )

## MEMORANDUM OPINION

In this patent infringement suit, defendants seek threshold dismissal, arguing (i) that there is no indirect or willful infringement, as defendants lacked the requisite pre-suit knowledge of the patents in issue, and (ii) that because of the nature of the '362 patent's claimed system, only the end computer user—here the consumer—can directly infringe this system claim. Plaintiff opposes this motion, arguing (i) that defendants had the requisite pre-suit knowledge of the patents in issue and, even if they did not, post-suit knowledge satisfies the knowledge requirement for willful and indirect infringement of the patents, and (ii) that defendants directly infringe the system claim by controlling each step of the system, including the first step. Accordingly, the motion to dismiss presents the following questions:

    (i)    Whether the pre-suit knowledge required for indirect and willful infringement is satisfied as a pleading matter, where, as here, (a) the patentee and the putative infringer used the same law firm, (b) the putative infringer was sued on a patent that cited the patent in issue as prior art, and (c) the putative infringer purchased a patent that cited the patent in issue as prior art;

    (ii)    Whether knowledge of the patents derived from the service or filing of the lawsuit provides the knowledge of the patents required for either indirect or willful patent infringement claims; and,

    (iii)    Whether the facts pled in the complaint are sufficient, if proved, to establish direct infringement of the system claim in issue.

For the reasons that follow, the motion to dismiss must be granted in part and denied in part, as follows:

(i)   The complaint fails to allege sufficient facts concerning pre-suit knowledge to state a claim for indirect infringement that is plausible on its face;

(ii)  The complaint adequately alleges sufficient facts concerning post-filing knowledge to state a claim for indirect infringement, as the service or filing of a law suit provides the knowledge of the patents required for indirect infringement with damages limited to the post-filing period;

(iii) The complaint fails to allege sufficient facts concerning pre-suit knowledge of the patents to state a claim for willful infringement that is plausible on its face, and willful infringement cannot be based solely on knowledge that arises from the service or filing of the lawsuit; and,

(iv)  The complaint adequately alleges sufficient facts to establish that defendants directly infringe the system claim in the '362 patent.

## I.[1]

### A.

Plaintiff Rembrandt Social Media, LP ("Rembrandt"), a Virginia limited partnership with a principal place of business in Bala Cynwyd, Pennsylvania, brings this patent infringement suit against defendants Facebook, Inc. ("Facebook") and AddThis, Inc. ("AddThis"). Facebook is a Delaware Corporation with a principal place of business in Menlo Park, California and AddThis is a Delaware Corporation with a principal place of business in Vienna, Virginia.

Rembrandt is the owner of the two patents in issue. U.S. Patent No. 6,415,316 (the '316 Patent), entitled "Method and Apparatus for Implementing a Web Page Diary," describes an invention that allows persons to create a personal diary on the World Wide Web wherein users are able to create a collection of personal information and third party content that is displayed on a personal webpage that can be shared with an authorized group of people. U.S. Patent No.

---

[1] The facts recited here are derived from the second amended complaint, the patents in issue, and the parties' pleadings.

6,289,362 (the '362 Patent), entitled "System and Method for Generation, Transferring, and

Using an Annotated Universal Address," describes a system that permits users to transfer third

party content automatically from a third party content provider's website to the user's personal

diary.

The claim at issue in this motion to dismiss is claim 7 of the '362 patent. Claim 7 is a

"system" claim,[2] which provides as follows:

> A computer system comprising:
>
> third party memory storing a transfer script that generates a request for a transfer
> applet from server memory;
>
> server memory storing an AUA [annotated universal address] database from
> which personalized web pages are construed and a transfer applet for establishing
> a communications link between a client browser and the server memory; and
>
> a client browser coupled to the third party memory and to the server memory for
> executing the transfer script and the transfer applet to transfer an AUA to an AUA
> database stored in the server memory, the AUA identifying a location of a content
> object and including an annotation authored by a content provider for controlling
> an aspect of a presentation of the object.

'362 Patent, Claim 7.

The '316 patent issued on July 2, 2002 and the '362 patent issued on September 11, 2001

to inventor Joannes Jozef Everardus Van Der Meer ("Van Der Meer"). Van Der Meer assigned

his patents to his company, Aldministrator Nederland B.V. ("Aduna"), and following Van Der

Meer's death in June 2004, his family assigned the patents to Rembrandt, a non-practicing entity.

Rembrandt now brings this suit against Facebook and AddThis, alleging that (i)

Facebook has willfully directly and indirectly infringed the '316 patent, (ii) Facebook and

---

[2] A system claim is a species of apparatus claims. *See Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1376 n.8 (Fed. Cir. 2011) ("Claims which recite a 'system,' 'apparatus,' 'combination,' or the like are all analytically similar in the sense that their claim limitations include elements rather than method steps."); *see also* Patent Claim Construction in the Federal Circuit § 1:23, at 122 (Edward D. Manzo ed., 2012).

AddThis have jointly and willfully, directly and indirectly infringed the '362 patent, and (iii) Facebook has willfully directly and indirectly infringed the '362 patent. More specifically, Rembrandt alleges that Facebook directly infringes the '316 patent by operating the www.facebook.com website, and indirectly infringes the '316 patent by inducing and contributing to infringement of the '316 patent by encouraging Facebook members to use what Rembrandt alleges is the 'web-based diary feature' of the www.facebook.com website. In addition, Rembrandt alleges that AddThis directly infringes the '362 patent by both making and using the system described in claim 7. Likewise, Rembrandt alleges that Facebook directly infringes the '362 patent by using the system described in claim 7.

In support of its indirect and willful infringement claims, Rembrandt alleges that Facebook had prior knowledge of the '316 and '362 patents from four separate sources. First, Rembrandt alleges that Aduna hired the law firm Fenwick & West to prosecute and maintain the '316 and '362 patents. Aduna maintained this relationship through July 2012. From 2008 until 2012, Fenwick & West also represented Facebook in patent prosecutions. Thus, Rembrandt alleges that it is plausible that a Fenwick & West attorney informed Facebook about the '316 and '362 patents. Second, Rembrandt alleges that on May 20, 2011, Facebook was served with a complaint alleging infringement of U.S. Patent No. 7,933,893, which cited the '362 patent as prior art. Third, Rembrandt alleges that in June 2012, Facebook acquired two patents that listed the '362 patent as prior art. Finally, Rembrandt argues that the original complaint in the instant case provides defendants with the requisite knowledge of the '316 and '362 patents for both indirect and willful infringement.

Defendants now seek threshold dismissal, claiming that the indirect infringement claims must be dismissed as Rembrandt has not adequately pled pre-suit knowledge and that post-suit

– 4 –

knowledge is insufficient to satisfy the knowledge requirement for an indirect infringement claim. Defendants also argue that for the same reasons, Rembrandt's claim for willful infringement must fail. Finally, defendants argue that the claim for direct infringement of claim 7 of the '362 patent must be dismissed as the only possible direct infringer is the consumer of defendants' services.

## II.

It is axiomatic that dismissal pursuant to Rule 12(b)(6), Fed.R.Civ.P., is required where the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Thus, the complaint must allege facts that, if true, plausibly satisfy each element of the claims for which relief is sought. If the complaint does not allege a sufficient factual basis to create a plausible inference that plaintiff is entitled to relief, then the motion to dismiss must be granted.

## III.

A party may indirectly infringe a patent either (i) by inducing direct infringement, in violation of 35 U.S.C. § 271(b), or (ii) by contributing to direct infringement, in violation of 35 U.S.C. § 271(c). Section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer," and § 271(c) provides, in pertinent part, that:

> Whoever offers to sell or sells within the United States . . . a component of a patented . . . apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

The Supreme Court has made clear that "§ 271(c) requires knowledge of the existence of the patent that is infringed" and "that the same knowledge is needed for induced infringement under

§ 271(b)." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2068 (2011). In *Global-Tech*, the Supreme Court explained that the knowledge requirement under § 271(c), as elucidated in *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964), "has become a fixture in the law of contributory infringement[.]" *Global-Tech*, 131 S.Ct. at 2068 (quoting 5 R. Moy, Walker on Patents § 15:20, p. 15–131 (4th ed. 2009)). Accordingly, because § 271(b) shares a common origin "in the pre-1952 understanding of contributory infringement, . . . [i]t would thus be strange to hold that knowledge of the relevant patent is needed under § 271(c) but not under § 271(b)." *Id.* Thus, both forms of indirect infringement—contributory infringement and inducement of infringement—require the putative infringer to know "of the existence of the patent that is infringed." *Id.*

Although the knowledge requirement for indirect infringement is now settled law under § 271(b) and (c), there is disagreement among the district courts as to whether post-suit knowledge may satisfy this knowledge requirement. On the one hand, a majority of district courts considering this issue have held that post-suit knowledge (i.e., knowledge provided by the filing of the lawsuit) satisfies the knowledge element for indirect infringement;[3] while on the other

---

[3] *See, e.g., Apeldyn Corp. v. Sony Corp.*, 852 F.Supp.2d 568, 573 (D. Del. 2012) (holding that "there is no legal impediment to having an indirect infringement cause of action limited to post-litigation conduct"); *Walker Digital, LLC v. Facebook, Inc.*, 852 F.Supp.2d 559, 565 (D. Del. 2012) (same); *Achates Reference Pub., Inc. v. Symantec Corp.*, No. 2:11cv294, 2013 WL 693955, *2 (E.D. Tex. Jan. 10, 2013) ("there is no requirement to allege pre-suit knowledge of the patent to state a claim for contributory infringement"); *Intellect Wireless Inc. v. Sharp Corp.*, No. 10cv6763, 2012 WL 787051 , *11 (N.D. Ill. Mar. 9, 2012) ("[d]efendants' knowledge of the patent as of the time of the suit's commencement can satisfy the knowledge requirement for conduct that post-dates the date of the complaint"); *Trading Techs. Int'l, Inc. v. BCG Partners, Inc.*, 2011 WL 3946581, 4 (N.D. Ill. Sept. 2, 2011) (holding that post-filing knowledge is sufficient for Rule 8, Fed.R.Civ.P.); *Symantec Corp. v. Veeam Software Corp.*, No. C12-00700, 2012 WL 1965832, *4 (N.D. Cal. May 31, 2013) ("The Court, however, will construe the complaints as covering contributory infringement for post-filing conduct, where the defendant's knowledge has been adequately alleged."); *Pacing Techs., LLC v. Garmin Int'l, Inc.*, No.

– 6 –

hand, a minority of district courts have held that post-suit knowledge does not satisfy the required knowledge element for indirect infringement.[4] The majority view bases the adequacy of post-suit knowledge on there being no sound reason that a defendant should avoid liability for an indirect infringement claim when it continues "to promote infringing uses of their products after learning about the patents," simply "because it happened to learn of the patent in connection with a lawsuit." *Intellect Wireless Inc.*, 2012 WL 787051, *11. The minority view courts take the position that permitting plaintiffs to plead post-suit knowledge requires courts "to bootstrap the knowledge Defendants *now* have based on Plaintiff's filing of the Complaint onto defendant's acts *before* [the filing of the complaint.]" *Proxyconn Inc.*, 2012 WL 1835680, *5. Further, those courts also suggest that requiring plaintiffs to plead pre-suit knowledge "furthers judicial economy and preserves parties' resources by encouraging resolution prior to filing a lawsuit." *Id.*

It is clear that the majority view is the sounder view. There is simply no substantive difference between (i) a putative infringer learning of a patent from a plaintiff's letter a day, or hours or even minutes before an infringement suit is filed or served, and (ii) a putative infringer learning of the patent from the filing or service of a complaint. In both instances, the putative infringer learns of the existence of the patent and for purposes of satisfying the knowledge

---

12cv1067, 2013 WL 444642, *2 (S.D. Cal. Feb. 5, 2013) ("For inducement occurring after the filing date, such allegations of knowledge suffice.").

[4] *See, e.g., Proxyconn Inc. v. Microsoft Corp.*, No. SACV 11-1681 DOC (ANx), 2012 WL 1835680, at *5 (C.D. Cal. May 16, 2012) ("a complaint fails to state a claim for indirect patent infringement where the *only* allegation that purports to establish the knowledge element is the allegation that the complaint itself or previous complaints in the *same* lawsuit establish the defendant's knowledge of the patent"); *Brandywine Communications Techs., LLC v. T-Mobile USA, Inc.*, No. 6:12cv272, 2012 WL 5266049, at *6 (M.D. Fla. Oct. 24, 2012) ("weight of authority addressing the knowledge required for indirect infringement . . . requires a plaintiff to allege that defendant had pre-suit knowledge of the patents-in-suit").

required to establish indirect infringement, it is immaterial how the putative infringer gains this knowledge. What matters is not how the putative infringer learned of the patents—by a letter from plaintiff prior to the filing of suit, by service of the complaint, or indeed from any source— but simply that the putative infringer has knowledge of the allegedly infringed patent and its claims; it is this knowledge of the patent and its claims by a putative infringer—however obtained—that is essential to a claim for indirect infringement. The filing and service of an infringement suit is merely one way of establishing this essential element of the indirect infringement claim.

But there is an important consequence of relying on the filing and service of the infringement suit to satisfy the knowledge requirement to establish indirect infringement: Plaintiff may only recover damages for indirect infringement for the period of time that commences once the putative infringer learns of the patent.[5] Thus, however the putative infringer learns of the allegedly infringed patent, infringement damages accrue only once the putative infringer learns of the patent.

Defendants argue that the pleading of post-filing knowledge fails to satisfy Rule 8, Fed.R.Civ.P. In essence, defendants argue that plaintiff cannot adequately allege the knowledge element of an indirect infringement claim if knowledge of the patent only arises post-suit. *See, e.g., Brandywine Comms.*, 2012 WL 5266049, at *6 ("finding that a complaint provides sufficient knowledge for induced infringement would vitiate the Supreme Court's holding . . .

---

[5] *See, e.g., Apeldyn Corp.*, 852 F.Supp.2d at 573–74 (The fact that plaintiff would be prohibited from collecting damages related to indirect infringement for any pre-knowledge (e.g., pre-filing) conduct is the only substantive consequence of allowing allegations such as those at bar to go forward.").

that an allegation of knowledge of the patent is required to state a claim for induced infringement").

This argument is not persuasive. First, it is clear that if a putative infringer continues to engage in indirect infringement of a patent after the filing of the suit, then a plaintiff may recover damages for that continued indirect infringement. Second, even if such an initial complaint fails to plead knowledge adequately, the appropriate relief would be dismissal without prejudice. The patentee could then file, as here, an amended complaint that alleges indirect infringement with notice of the patent in issue based on the filing of the original complaint.[6] Thus, there is no sound basis for precluding a plaintiff from alleging the requisite knowledge for indirect infringement on the basis of the filing of the lawsuit. But in that instance, of course, damages would be limited to the post-filing period.

Although the amended complaint adequately alleges indirect infringement beginning with the service of the complaint, plaintiff here claims much more. Specifically, plaintiff claims that defendants' knowledge of the '362 patent may be appropriately inferred from three sources: (i) Facebook and the predecessor-in-interest of the '362 patent shared the same law firm, (ii) Facebook purchased a patent that cited the '362 patent as prior art, and (iii) Facebook was served with a lawsuit over a patent that cited the '362 patent as prior art. Yet, none of these facts gives rise to anything more than a conceivable possibility of knowledge of the '362 patent, rather than a plausible inference that Facebook possessed such knowledge. To begin with, the fact that Facebook and the '362 patent's predecessor-in-interest shared the same law firm is not, without more, sufficient for pleading knowledge under *Iqbal / Twombly*. Rembrandt has not even alleged that the same lawyers in that law firm worked on matters for both patents, and moreover, the

---

[6] Notably, some of the minority view courts acknowledge that "Federal Rule of Civil Procedure 15(d) provides a procedure for pleading post-suit facts." *Proxyconn Inc.*, 2012 WL 1835680, *6.

prosecution of the '362 patent was completed years before Facebook allegedly hired that law firm. Thus, without more, the fact that the two parties shared a law firm at some point in the past falls far short of raising a plausible inference of pre-suit knowledge of the '362 patent, or indeed either patent. Similarly, the fact that a patent purchased by Facebook cites the '362 patent as prior art is not enough, by itself, to establish that Facebook had the requisite pre-suit knowledge of the '362 patent. Significantly, Facebook did not even prosecute the application for the patent that cites the '362 patent as prior art; instead, Facebook purchased that patent from America Online, Inc. Thus, the mere allegation that a patent purchased by Facebook cites the '362 patent as prior art makes it, at best, only conceivable, not plausible, that Facebook might have learned of the '362 patent in the course of purchasing a patent. Finally, the fact that Facebook was sued on a patent that cited the '362 patent falls far short of warranting a plausible inference of pre-suit knowledge of the '362 patent; indeed, it appears that the lawsuit referred to was voluntarily dismissed prior to Facebook filing an answer. In sum, Rembrandt has failed to plead any facts that make it plausible, rather than merely conceivable, that Facebook had knowledge of either patent in issue prior to the filing of this suit. Accordingly, the claims for indirect infringement based upon pre-suit knowledge must be dismissed.

## IV.

It is well-settled "that enhancement of damages must be premised on willful infringement[.]" *Beatrice Foods Co. v. New England Printing & Lithographing Co.*, 923 F.2d 1576, 1578 (Fed. Cir. 1991). Because "increased damages are punitive, the requisite conduct for imposing them must include some degree of culpability" and an "act of willful infringement satisfies this culpability requirement[.]" *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996). Thus, a plaintiff alleging willful infringement must therefore establish (i) that "by clear

– 10 –

and convincing evidence . . . the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and (ii) that "this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).[7]

Importantly, the Federal Circuit has made clear that "in ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct." *Id.* at 1374. Accordingly, "a patentee must have a good faith basis for alleging willful infringement . . . , [s]o a willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct." *Id.* Thus, Federal Circuit authority makes clear that an allegation of willful infringement must depend upon pre-suit knowledge of the patent in issue. To conclude otherwise would lead to the anomalous result that every lawsuit alleging infringement could include a willful infringement claim based on simply the filing or the serving of the complaint. This anomalous result is neither sensible nor intended by the statutory patent damages provision, 35 U.S.C. § 284.[8] Not surprisingly, the parties cite no case, and none has been found, in which post-suit knowledge was held sufficient to support a claim for willful infringement.[9]

---

[7] *See also State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("To willfully infringe a patent, the patent must exist and one must have knowledge of it.").

[8] A plaintiff's proper remedy for reckless post filing conduct is to seek a preliminary injunction, and "a decision to grant or deny a preliminary injunction is based on the district court's consideration of four factors: '(1) the likelihood of the patentee's success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." *Erico Int'l v. Vutec Corp.*, 516 F.3d 1350, 1353–54 (Fed. Cir. 2008) (quoting *PHG Techs., LLC v. St. John Cos., Inc.*, 469 F.3d 1361, 1365 (Fed. Cir. 2006)) (internal quotation marks omitted).

[9] *See, e.g., LML Holdings, Inc. v. Pacific Coast Distributing, Inc.*, No. 11cv06173, 2012 WL 1965878, *5 (N.D. Cal. May 30, 2012) (noting that plaintiff there could not "cite a single case in which the fact that a suit was filed was grounds for a finding that an infringer's post-filing conduct . . . [was] willful[]").

A close examination of the amended complaint at issue makes clear that Rembrandt has not adequately pled pre-suit knowledge for willful infringement. As noted above, Rembrandt has failed to allege any facts that would support a plausible inference that defendants had pre-suit knowledge of the patents in issue. At most, Rembrandt has pled various facts that make it conceivable that Facebook might have learned about the patents in issue, but Rembrandt has not pled sufficient facts to invite the plausible inference that Facebook had the requisite pre-suit knowledge of either patent. Accordingly, the claims for willful infringement must be dismissed.

**V.**

Analysis next proceeds to defendants' argument that plaintiff's allegation of direct infringement of claim 7—the system claim—fails because the system is used and made by the end user—the consumer—not defendants.

The Federal Circuit recently made clear that "to 'use' a system for purposes of infringement [of a system claim], a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it." *Centillion Data Systems, LLC v. Qwest Comms. Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). Importantly, this does not mean that a party must exercise direct control over each individual element of the system; instead, "direct infringement by 'use' of a system claim 'requires a party . . . to use each and every . . . element of a claimed [system].'" *Id.* (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005)) (alterations in original). Similarly, in order to "make" a system under § 271(a), a putative infringer must "combine all of the claim elements[.]" *Id.* at 1288.

*Centillion* is the latest circuit pronouncement concerning infringement of a system claim, and carefully read, this decision points persuasively to the correct result here. In *Centillion*, the claim in issue was a system claim consisting of the following four elements: (1) "storage means

for storing transaction records," (2) "data processing means for generating summary reports as specified by a user from the transaction records," (3) "transferring means for transferring the transaction records and summary reports to a user," and (4) "personal computer data processing means adapted to perform additional processing on the transaction records." *Centillion*, 631 F.3d at 1281. The first three elements, termed the 'back end' system, were maintained by the service provider, while the last element, termed the 'front end' system, was maintained by the end user. *Id.* On these facts, the Federal Circuit on summary judgment held that Qwest's customers "used" the system in issue by engaging the "on-demand function where a customer 'seeks particular and specified information' by creating a query that the Qwest back-end system processes and provides a result for download[.]" *Id.* at 1285. In the Federal Circuit's words,

> The customer controls the system by creating a query and transmitting it to Qwest's back-end. The customer controls the system on a one request/one response basis. This query causes the back-end processing to act for its intended purpose to run a query and return a result. The user may then download the result and perform additional processing as required by the claim. If the user did not make the request, then the back-end processing would not be put into service.

*Id.* Thus, by "causing the system as a whole to perform this processing and obtaining the benefit of the result, the customer has 'used' the system under § 271(a)." *Id.* The Federal Circuit further explained that "it makes no difference that the back-end processing is physically possessed by Qwest." *Id.* Likewise, the Federal Circuit also noted that the customers used the system when they subscribed to the service because in both modes of operation "it is the customer initiated demand for the service [that] causes the back-end system to generate the requisite reports." *Id.* Accordingly, the Federal Circuit concluded that but for the customer's actions, "the entire system would never have been put into service." *Id.* The Federal Circuit further concluded that unlike the customers, Qwest did not, as a matter of law, "use" the system in issue. Although Qwest made the

back-end processing elements, it never 'uses' the entire claimed system because it
never puts into service the personal computer data processing means. Supplying
the software for the customer to use is not the same as using the system.

*Id.* In other words, Centillion's use infringement claim failed because Qwest only used three of
the four elements of the system claim: only the customer used the fourth element.

Similarly, the Federal Circuit held that Qwest did not "make" the system as a matter of
law, because Qwest does not combine all of the claim elements; instead, the "customer, not
Qwest, completes the system by providing the 'personal computer data processing means' and
installing the client software." *Id.* at 1288. Distilled to its essence, then, *Centillion* teaches that
an infringer may use a system (i) by causing the system to perform the whole process and
obtaining a benefit, or (ii) by placing into use each element of the claimed system. *See id.*

Given this, it follows that a result different from *Centillion* must obtain here because the
complaint alleges that defendants (i) place into use each element of the system or (ii) combine to
use each element of the system. More specifically, Rembrandt alleges that Facebook uses the
claim 7 system through its Facebook Transfer System, wherein Facebook transfers content
specified by Facebook members to Facebook's servers. Rembrandt alleges that the Facebook
Transfer System places into use all three elements of the claim 7 system. In particular,
Rembrandt alleges that the Facebook Transfer System consists of

(i)     "Third-party content-provider webserver memory that stores the Facebook
        Transfer Applet that transfers data that has been 'like' or 'shared' by a
        Facebook member from the member's Internet browser to a Facebook server,
        where it is stored in a Facebook database";

(ii)    "Facebook memory for storing a database containing liked or shared content
        with associated links and the above-mentioned transfer applet"; and,

(iii)   "An Internet browser on the Facebook member's computer that is coupled to
        both the third-party content-provider webserver memory and the Facebook
        memory and which executes the Facebook Transfer Script and the Facebook
        Transfer Applet in order to transfer annotated data that has been 'liked' or

> shared' by a Facebook member from the member's Internet Browser to a Facebook server, where it is stored in a Facebook database."

Second Amended Complaint, ¶ 82. Put simply, Rembrandt alleges that (i) Facebook's Facebook Transfer System uses all three elements of the claim 7 system, and (ii) Facebook derives a benefit from its use of this system because it "uses this collected information to provide content for the Facebook social network, and to generate targeted advertising to Facebook members." Second Amended Complaint, ¶ 83. Thus, unlike the *Centillion* defendant, Facebook itself is alleged to use every element of the claimed system, and accordingly, Rembrandt has adequately alleged direct infringement of the claim 7 system.

Second, Rembrandt has adequately alleged that defendants jointly 'use' all three elements of the claim 7 system. Specifically, Rembrandt alleges that the Facebook–AddThis Transfer System consists of:

(i) "AddThis memory that stores the AddThis–Facebook widget that, when executed, requests that Facebook Transfer Applet that transfers data that has been 'liked' or 'shared' by a Facebook member from the member's browser to a Facebook server, where it is stored in a Facebook database";

(ii) "Facebook memory for storing a database containing liked or shared content with associated links and the Facebook Transfer Applet"; and,

(iii) "A browser on the Facebook member's computer that is coupled to both the AddThis memory and the Facebook memory and which executes the AddThis–Facebook widget and the Facebook Transfer applet in order to transfer annotated data that has been 'liked' or 'shared' by a Facebook memory from the member's browser to a Facebook server, where it is stored in a Facebook database."

Second Amended Complaint, ¶ 51. In other words, Rembrandt alleges that the defendants jointly place into use each element of the claim 7 system. Unlike the *Centillion* defendant, the defendants, not the consumers or customers, are alleged to have, themselves, placed into use each element of the claim 7 system. Accordingly, Rembrandt has adequately alleged that defendants jointly infringe Claim 7 by 'using' the system.

Further, Rembrandt has adequately alleged that AddThis directly infringes claim 7 by 'making' the system. In this regard, Rembrandt alleges that AddThis makes the claim 7 system by making the entire Facebook–AddThis Transfer System. Thus, because it is alleged that AddThis 'makes' the claim 7 system by combining all of the claim elements, it is clear that Rembrandt has adequately alleged that AddThis directly infringes claim 7.

Defendants argue that the direct infringement claims relating to the claim 7 system fail because the transfer script and transfer applet are only transferred to, and executed by, the client browser in response to the Facebook user pressing the 'Like' or 'Share' button. Thus, defendants argue that the direct infringement claims at issue here are indistinguishable from those in *Centillion*. This argument is not persuasive. To begin with, the pressing of the 'like' or 'share' button is not alleged to be an element of the Claim 7 system; instead, it is merely an action that precedes the operation of the system. Although defendants' use of the system may be preceded by a Facebook user pressing the 'like' or 'share' button, Rembrandt has adequately alleged that defendants place into use each element of the claimed system. In other words, even though defendants' use of the system may be put in motion by the Facebook user, defendants themselves directly infringe the system because they place into use each element of the claimed system. In *Centillion*, by contrast, the putative infringer only placed three of the four elements into use, with the fourth element being placed into use by the consumer. Importantly, this does not mean that the Facebook user does not infringe the claimed system when the user clicks on the 'like' or 'share' button; to the contrary, the users may also infringe the claimed system by making use of each element. As the Federal Circuit's analysis in *Centillion* makes clear, a consumer's direct infringement does not preclude the producer's direct infringement. *See Centillion*, 631 F.3d at 1285–86. In other words, direct infringement by a consumer's use of a

– 16 –

system (here, the pressing of the 'like' button), does not preclude the direct infringement by the producers (here, placing into use each element of the claimed system). Accordingly, the motion to dismiss the direct infringement of claim 7 of the '362 patent must be denied. Of course, the result reached here in no way decides the ultimate direct infringement question, as the facts may ultimately develop such that this case will prove to be indistinguishable from *Centillion* and require the same result. Yet, it is clear that dismissal is not appropriate at the pleading stage in this case because plaintiff has adequately pled the direct infringement of claim 7 of the '362 patent.

## VI.

For the reasons stated, defendants' motion to dismiss must be granted in part and denied in part. Defendants' motion to dismiss the claim for willful infringement must be granted, and that claim must be dismissed. Defendants' motion to dismiss the indirect infringement claim must be granted in part, and denied in part; it must be granted insofar as the claim seeks pre-filing damages and any claims for damages from indirect infringement must be limited to the period of time commencing with the service of the complaint. Defendants' motion to dismiss must be denied in all other respects.

An appropriate order will issue.

Alexandria, VA
June 12, 2013

T. S. Ellis, III
United States District Judge

– 17 –