**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

REMBRANDT SOCIAL MEDIA, LP

        Plaintiff,

  v.

FACEBOOK, INC.

        Defendant.

Civil Action No. 1:13-cv-158 (TSE/TRJ)

**REMBRANDT'S OPPOSITION TO FACEBOOK'S MOTION**
**TO EXCLUDE THE TESTIMONY OF JAMES E. MALACKOWSKI**

# TABLE OF CONTENTS

I.      INTRODUCTION ...............................................................................................1

II.     THE APPORTIONMENT METHODOLOGY WAS
        CORRECT ........................................................................................................2

        A.      The Apportionment Properly and Necessarily Began
                with Total Revenue ...............................................................................5

        B.      The Apportionment Correctly Was Based on the
                Patented Features ..................................................................................6

        C.      Facebook's "Minor Improvements" Argument Raises a
                Non-Infringing Alternative Dispute Relevant to Rate
                Rather than Apportionment, and Is a Fact Issue for Trial....................9

        D.      Inclusion of the Convoyed Features Was Proper.................................12

        E.      Facebook's Other Criticisms also Go to Weight, not
                Admissibility.......................................................................................13

III.    THE RATE METHODOLOGY WAS CORRECT ........................................16

        A.      The Lower Bound of the Range Was Properly Based on
                the Patent Owner's Own Transactions Relating to the
                Patented Technology...........................................................................16

        B.      The Upper Bound Simply Reflects Facebook's Entire
                Surplus Attributable to the Inventions, to Be Divided at
                the Hypothetical Negotiation ..............................................................20

        C.      The 5-6% Royalty Conclusion Was Reasonably Based
                on the Evidence...................................................................................21

IV.     CONCLUSION................................................................................................25

i

## TABLE OF AUTHORITIES

CASES                                                                                      PAGE(S)

*ActiveVideo Networks, Inc. v. Verizon Commc'ns Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012).................................................................... passim

*Anderson v. Nat'l R.R. Passenger Corp.*,
    866 F.Supp. 937 (E.D. Va. 1994), *aff'd.* 74 F.3d 1230 (4th Cir.1996)...................................22

*Belk, Inc. v. Meyer Corp., U.S.*,
    679 F.3d 146 (4th Cir. 2012) ................................................................13

*Carnegie Mellon Univ. v. Marvell Tech Grp., Ltd.*,
    2012 WL 3679564 (W.D. Pa. Aug. 24, 2012) .................................................5, 6, 7

*Cornell Univ. v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y. 2009) (Radar, J.) ........................................7, 8, 16

*Daubert v. Merrell Dow Pharms., Inc.*
    *509 U.S. 579 (1993)* ................................................................ 2

*ePlus Inc. v. Lawson Software Inc.*,
    764 F. Supp. 2d 807 (E.D. Va. 2001) ...............................................23, 24

*Ergotron, Inc. v. Rubbermaid Commercial Prods., LLC*,
    2012 WL 3733578 (D. Minn. 2012) .................................................21

*Fractus, S.A. v. Samsung Elecs. Co., Ltd.*,
    876 F. Supp. 2d 802 (E.D. Tex. 2012)................................................5, 6

*Garretson v. Clark*,
    111 U.S. 120 (1884)................................................................2

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010)........................................................1, 10

*Internet Machs. LLC v. Alienware Corp.*,
    2013 WL 4056282 (E.D. Tex. 2013) ...................................................19

*Interwoven, Inc. v. Vertical Computer Sys.*,
    2013 U.S. Dist. LEXIS 100790 (N.D. Cal. July 18, 2013)...............................18, 19

*Lam, Inc. v. Johns-Manville Corp.*,
    718 F.2d 1056 (Fed. Cir. 1983)........................................................21

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012).................................................... passim

*Lucent Techs. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)...................................................................8, 9, 14

*Micro Chem., Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003)..............................................................2, 10, 13, 16

*Oracle Am., Inc. v. Google Inc.*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ...........................................................24

*PACT XPP Techs., AG v. Xilinx, Inc.*,
    Civ. No. 07-563, 2012 WL 1666390 (E.D. Tex. May 11, 2012)...............................6

*PBM Prods., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ...........................................................................13

*ResQNet.com v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)...........................................................................19

*Rite-Hite Corp. v. Kelly Co.*,
    56 F.3d 1538 (Fed. Cir. 1995)......................................................................12, 23

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
    953 F.2d 1360 (Fed. Cir. 1991)..........................................................................14

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)........................................................................................21

*Suffolk Techs. LLC v. Aol Inc.*,
    2013 U.S. Dist. LEXIS 64630 (E.D. Va. Apr. 12, 2013)........................................24

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)................................................................... passim

*Veritas Operating Corp. v. Microsoft Corp.*,
    2008 U.S. Dist. LEXIS 112135 (W.D. Wash. Feb. 26, 2008) .................................21

*Visteon Global Techs., Inc. v. Garmin Int'l, Inc.*,
    903 F. Supp. 2d 521 (E.D. Mich. 2012).................................................................9

*VS Techs. v. Twitter*,
    No. 2:11cv43, 2011 WL 4744572 (E.D. Va 2011) ............................................2, 22

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ..............................................................................2

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996)..............................................................................9

**OTHER AUTHORITIES**

Rule 702, Fed. R. Evid..........................................................................................................10, 24

McCarthy, Trademarks and Unfair Competition § 32:170 (4th ed. 2012) ...................................13

## I.     INTRODUCTION

Facebook criticizes virtually every aspect of the Malackowski damages expert report, from his initial apportionment of Facebook's advertising revenue to the accused patented features to his ultimate judgment of 5-6% as the reasonable royalty rate.  This barrage of criticisms falls far short of justifying exclusion of Mr. Malackowski's testimony.  At most, Facebook points to disputed issues that can be raised on cross-examination and argued to the jury as bearing on the weight it should give to the testimony.  The overall framework for considering disputed criticisms of this sort was set out by the Federal Circuit in *ActiveVideo* as follows:

> Verizon points out various weaknesses in the damages assessment by ActiveVideo's expert.  At their core, however, Verizon's disagreements are with the conclusions reached by ActiveVideo's expert and the factual assumptions and considerations underlying those conclusions, not his methodology.   These disagreements go to the weight to be afforded the testimony and not its admissibility.   *See i4i*, 598 F.3d at 854 (holding that a party's quarrel with the facts the damages expert used go to the weight, not admissibility, of the expert's opinion).   The degree of comparability of the Gemstar and Grande license agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion.   *See id.* at 852 ("[W]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.")   The district court did not err by failing to exclude the testimony of ActiveVideo's damages expert.[1]

As in *ActiveVideo*, Mr. Malackowski's methodology was sound, and the supposed weaknesses of his analysis go at most "to the weight to be afforded the testimony and not its admissibility."[2]   Accordingly, the "Court need not determine whether [his expert] testimony is

---

[1]     *ActiveVideo Networks, Inc. v. Verizon Commc'ns Inc*., 694 F.3d 1312, 1333 (Fed. Cir. 2012).

[2]     *Id.*

correct, but should leave such conclusions to the jury after 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'"[3]

## II.    THE APPORTIONMENT METHODOLOGY WAS CORRECT

Unlike many of the cases relied on in Facebook's brief, Mr. Malackowski does not use the entire market value of the accused Facebook system as the royalty base.  On the contrary, he acknowledged that the entire market value rule (EMVR) appropriately prohibits basing a damages analysis on the entire revenue generated by an accused system when the patent being enforced covers only certain features of the system.  When, as here, the accused system includes both patented and unpatented features, the patent owner must apportion the total revenue between the patented and unpatented features to determine the fraction of total revenue to be used as the royalty base in a reasonable royalty analysis.  The apportionment should evaluate the extent to which demand for the entire product is driven by the patented features compared with the unpatented features.  As the Supreme Court long-ago explained and the Federal Circuit reaffirmed in *Uniloc*,

> [T]he patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages *between the patented feature and the unpatented features*, and such evidence must be reliable and tangible, and not conjectural or speculative.[4]

---

[3]    *VS Techs. v. Twitter*, No. 2:11cv43, 2011 WL 4744572, at *3 (E.D. Va 2011) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharms., Inc. 509 U.S. 579, 596 (1993)*); *see also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit.")

[4]    *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (emphasis added) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("[I]t is generally required that royalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit.") (internal citations omitted).

Mr. Malackowski carried out precisely the required apportionment *between the patented and unpatented features*.

Facebook's accused website system offers users a number of features, only some of which are covered by the claims of Rembrandt's two asserted patents. Rembrandt commissioned two surveys to evaluate the extent to which the infringing features motivate people to use Facebook—what makes them join and keeps them coming back. This information about what drives user demand for Facebook and thus has driven the massive increase in user population during the period of infringement is important because it is undisputed that Facebook usage is the foundation of its advertising revenue.[5] More Facebook usage means more targets, attracting more advertisers.[6] And more Facebook usage means more opportunities for Facebook to sell advertisements (what Facebook calls inventory) to the advertisers.[7] As Facebook's damages expert (Dr. Iansiti) put it: ██████████████████████████████

---

[5] Facebook Br. at 20 (explaining that network effect is "the value of the sheer size of Facebook's one billion monthly active user community, which is a factor that is obviously important to advertisers.").

[6] *See, e.g.*, Expert Report of James E. Malackowski ("Malackowski Report") § 5.3 ("Display advertisers run ads on Facebook because of the amount of time users spend on Facebook and its large user base." (citing Facebook Inc. Form S-1/A (Securities Registration Statement), filed May 16, 2012, attached as Exhibit 3 to the Declaration of Daniel Gopenko in Support of Rembrandt's Opposition to Facebook's Motions to Exclude Experts' Testimony ("Gopenko Decl.")); Matt Lynley, "Facebook's IPO Roadshow: Here's Why Facebook Thinks Investors Should Buy Into Its IPO," *Business Insider*, May 3, 2012, at 23, attached as Exhibit 4 to the Gopenko Decl. A copy of the Malackowski Report was attached as Exhibit 1 to the Declaration of Paul Batcher in Support of Facebook's Motions to Exclude Experts' Testimony ("Batcher Decl.")

[7] *See e.g.*, Malackowski Report § 5.3 ("The first component of Facebook's advertising revenue is the number of advertisements sold. Various studies indicate that there are a significant number of users available for advertising impressions via Facebook.").

████████████████████████████████████████[8] And to further connect the Facebook features to its advertising revenue Rembrandt also commissioned a survey of advertisers themselves to evaluate the extent to which the infringing features drive their decisions to advertise on Facebook.

Mr. Malackowski then used the survey results to apportion the total advertising revenue stream to the fraction fairly attributable to the infringing features.  His reasoning was that if the surveys showed that users attributed to the infringing features a certain percentage—call it "X"—of why they use Facebook, then X percent of the total revenue would fairly represent the base to which a royalty rate should be applied.  The reasoning behind the advertising survey was much the same, simply approaching the issue from a different angle.  As it turned out, the user and advertising surveys were reasonably consistent with each other, reinforcing their reliability.[9]

Mr. Malackowski included in his apportionment not only the Facebook features that are directly covered by the patent claims, but also several other "convoyed" features that users cannot use without also using the claimed features and that would have no value by themselves. This inextricable linkage of the convoyed features to the infringing features means that Facebook drives demand for its system not only by offering the infringing features themselves but additionally by offering the convoyed features which in turn depend on the infringing features to function.[10]

---

[8]   Expert Rebuttal Report of Professor Marco Iansiti ("Iansiti Report") ¶ 22.  A copy of the Iansiti Report is attached as Exhibit 7 to the Batcher Decl.

[9]   *See* Malackowski Report § 10.3.2.

[10]   Rembrandt's expert Frederick Bien described the inextricable linkage in his report.  Expert Report of Frederic Bien ("Bien Report") ¶¶ 260-264 ("[A]lthough the surveys valued Timeline and News Feed as functionalities separate from the rest of the 21 Facebook features tested, the separate values found for other features that are inextricably linked to Timeline and News Feed as discussed above—Like (inside and outside Facebook), Share (inside and

Facebook criticizes Mr. Malackowski's apportionment methodology on several grounds, each of which amounts to no more than an argument to be resolved at trial.

### A.    The Apportionment Properly and Necessarily Began with Total Revenue

The first criticism is that Mr. Malackowski should not have started the apportionment with Facebook's entire revenue stream.  But how else could anyone apportion a total without starting with the total?  Courts that have considered the issue have found "an apportionment analysis needs to start somewhere, and simply starting with the total operating profit does not inherently invoke the entire market value rule."[11]

Facebook quotes from *Uniloc* and *LaserDynamics*, but these cases were concerned with the inappropriate use of the entire revenue stream as a royalty base, the opposite of what Mr. Malackowski does here.  For example, in *Uniloc* the patent covered only a specific activation feature of Microsoft's Windows product.  Yet the patentee's expert testified that his damages rate of 2.9% applied to the total $19 billion in revenues Microsoft derived from Windows sales, and the patentee criticized Microsoft's expert on the ground that his proposed award represented only .000035% of that total Windows revenue.  Similarly, the quote from *LaserDynamics* is concerned with the "error of an improperly admitted entire market value rule theory."[12]  Neither case held that it was improper, instead, to use the total revenue merely as a starting point for an

---

outside Facebook), Comment, Share Photos/Video, Add Photos/Video, Photo Tagging, Find Friends, Friend Request—should be considered in conjunction with the values found for Timeline and News Feed separately to appreciate the full value of the Timeline and News Feed "Pillars" in motivating membership in and advertising on Facebook.").  A copy of the Bien Report is attached as Exhibit 2 to the Batcher Decl.

[11]  *Carnegie Mellon Univ. v. Marvell Tech Grp., Ltd.*, No. 2:09-cv-00290-NBF, 2012 WL 3679564, at *4 (W.D. Pa. Aug. 24, 2012) (citing *PACT XPP Techs., AG v. Xilinx, Inc.*, Civ. No. 07-563, 2012 WL 1666390, at *2 (E.D. Tex. May 11, 2012)); *Fractus, S.A. v. Samsung Elecs. Co., Ltd.*, 876 F. Supp. 2d 802, 833-35 (E.D. Tex. 2012).

[12]  *LaserDynamics*, 694 F.3d at 68.

apportionment down to the proper royalty base attributable to the patented features, as Mr. Malackowski does here.  And courts that have considered use of total revenue for the sole purpose of properly apportioning that revenue between the patented and unpatented features have confirmed the admissibility of such testimony.[13]

### B.   The Apportionment Correctly Was Based on the Patented Features

The second criticism is that Mr. Malackowski supposedly used the wrong features in his apportionment.  Facebook argues that he should have used BigPipe and Audience Symbol, not "broader Facebook features" like Timeline and News Feed.  But Timeline and News Feed, as well as Groups, and Photo/Video Sharing[14] are the specific features covered by the claims.  In spite of the extended discussion of BigPipe at the summary judgment hearing, BigPipe and

---

[13]   *See, e.g.*, *Carnegie Mellon*, 2012 WL 3679564, at *4 ("[T]he Court finds that Ms. Lawton has not applied the entire market value rule simply by referencing Marvell's total operating profit on a per-unit basis. Instead, she has used the average operating profit as a starting point for her apportionment analysis. Simple reference to average operating profits for the purpose of showing a starting point is justified, so long as the testimony does not lapse into statements that tend to show how 'reasonable' a royalty is when compared to a much larger amount."); *Fractus, S.A.*, 876 F. Supp. 2d at 833-35 ("Mr. Nawrocki did not improperly invoke the entire market value rule. Instead, Mr. Nawrocki presented substantial evidence 'tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.' *Uniloc USA, Inc.*, 632 F.3d at 1318  . . . . Mere reference to the average price of the accused devices, prior to apportionment, did not create a situation akin to where '[t]he $19 billion cat was never put back into bag even by Microsoft's cross-examination.' *Uniloc USA, Inc.*, 632 F.3d at 1320.  Mr. Nawrocki clearly and unequivocally stated that he was not relying on the average price of the phone as his royalty base."); *PACT XPP Techs., AG*, 2012 WL 1666390, at*2 ("PACT admits that Mr. Nawrocki's analysis starts with the average sales price of the accused products, but argues that the entire market value is not being invoked because Mr. Nawrocki apportioned the average sales price using the 30% apportionment factor, and made other adjustments to account for the profitability of the accused products. . . . The Court agrees with PACT that Mr. Nawrocki apportioned the average sales prices of the accused products to account for the contribution of the unpatented features to the accused products' value, and therefore did not invoke the entire market value rule.").

[14]   Hereafter in this Opposition we will refer to Timeline and News Feed as representative of the four accused infringing features.

Audience Symbol correspond only to individual elements of the claims and do not by themselves infringe.  Although Facebook chose to focus on the functionality of BigPipe in its attempt to obtain summary judgment of non-infringement, BigPipe, standing alone, is not a proper focus for the damages analysis.  Indeed, by themselves BigPipe and Audience Symbols are not even functional.  BigPipe, for example, is part of the diary program of the '316 claims and the applet of certain '362 claims, but could not function apart from the entire system set out in the respective claims.  Similarly, the Audience Symbols could not function by themselves.

By contrast, Timeline and News Feed, which Facebook founder Mark Zuckerberg calls two of the three "pillars"[15] of Facebook, are fully operational features that meet every element of the claims and so are the infringing features that are the logical objects of the apportionment.

The Federal Circuit has made clear that it is the *infringing features* that should be compared to the rest of the system to carry out the apportionment.  We quote once again the definitive passage in *Uniloc*:

> [T]he patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages *between the patented feature and the unpatented features*, and such evidence must be reliable and tangible, and not conjectural or speculative.[16]

And in *LaserDynamics* the Federal Circuit held that the result of the apportionment must itself be a "patent practicing unit":

> [I]t is generally required that royalties be based not on the entire product, but instead on the "smallest saleable *patent practicing unit*."[17]

---

[15]   *See* R00001607 – R00001611 at R00001607 ("Mark Zuckerberg has described Timeline, News Feed, and Graph Search as the "Three Pillars of the Facebook ecosystem"), attached as Exhibit 5 to the Gopenko Decl.; Malackowski Report § 10.2.2.1.

[16]   *Supra*, p. 2.

[17]   *LaserDynamics*, 694 F.3d at 67 (emphasis added) (quoting *Cornell Univ. v. Hewlett-Packard Co.,* 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009) (Radar, J.)).  *See also Cornell Univ.,*

Timeline and News Feed meet both of these legal requirements because they are "infringing" and "patent practicing."  Big Pipe and Audience Symbol meet neither requirement because they are simply elements of Timeline and News Feed, and of the claims, and are neither "infringing" nor "patent practicing" by themselves.  We know of no authority calling for subdividing a patent practicing unit into components that are by themselves not patent practicing to carry out the required apportionment.[18]

In contrast to Mr. Malackowski's proper apportionment here, in those cases in which the Federal Circuit found that the patentee inappropriately relied on the entire market value rule, the patented invention was a small, divisible component of a larger product, and the patentee tried to use the entire product, which was not covered by the claims, as the royalty base.  For example, in *LaserDynamics* the Federal Circuit rejected the use of revenues from the entire laptop, instead of just the patent practicing ODD, as a base.[19]  In *Uniloc*, the Federal Circuit rejected using the entire market value of Window's Office software rather than just the infringing product, Office's "Product Activation" feature.[20]  And in *Lucent*, the court rejected using the entire value of Outlook, instead of the infringing date picking tool when "the vast majority of the features [in

---

609 F. Supp. 2d at 288 (requiring the patentee to determine "the smallest salable *infringing unit* with close relation to the claimed invention").

[18]  Even Facebook, in its Brief at page 2, seems to acknowledge that it is the "infringement" that must drive the apportionment, quoting the Federal Circuit's description of the appropriate base as "the revenue pool implicated by the infringement."  Facebook Br. at 7 (quoting *Cornell*, 609 F. Supp. 2d at 286).

[19]  *LaserDynamics*, 694 F.3d at 68 ("Whether called 'product value apportionment' or anything else, the fact remains that the royalty was expressly calculated as a percentage of the entire market value of a laptop computer rather than a patent-practicing ODD alone.  This, by definition, is an application of the entire market value rule.").

[20]  *Uniloc*, 632 F.3d at 1318-19.

Outlook], when used, do not infringe."[21]  Thus, these cases do not support excluding the testimony here.

### C. Facebook's "Minor Improvements" Argument Raises a Non-Infringing Alternative Dispute Relevant to Rate Rather than Apportionment, and Is a Fact Issue for Trial

Next, Facebook notes that Timeline and News Feed were already features of its system before 2009 when BigPipe and Audience Symbols were first incorporated into those features. Facebook's argument is that at the 2009 hypothetical negotiation under *Georgia Pacific* it could have simply stayed with its existing technology rather than pay royalties to be able to use the "minor improvements" that they assert are all BigPipe and Audience Symbols amount to. Facebook also relies on *Lucent* to the effect that a "small improvement" justifies only a royalty on the incremental value of the improvement.[22]  Of course, this entire argument rests on the question of whether the patented technology is in fact only a "minor" or "small improvement."

In substance, the rationale of Facebook's argument is that its pre-2009 system is a non-infringing alternative that it could have stuck with instead of taking a license.  But non-infringing alternative arguments apply to what reasonable royalty *rate* the parties to the hypothetical negotiation would have settled on and do not bear on apportionment of the base to which that rate should be applied.[23]  Moreover, because Facebook's argument really rests on the accuracy of its "minor improvement" characterization of its BigPipe and Audience Symbol—a misleading characterization that Rembrandt will challenge at trial—the argument is a fact dispute that should

---

[21]  *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009).

[22]  Facebook Br. at 8-9.

[23]  *See Zygo Corp. v. Wyko Corp*., 79 F.3d 1563, 1571-72 (Fed. Cir. 1996) (remanding for reconsideration of the royalty rate in light of the fact that defendant could have continued to use a non-infringing product); *see also Visteon Global Techs., Inc. v. Garmin Int'l, Inc.*, 903 F. Supp. 2d 521, 528 (E.D. Mich. 2012).

be resolved at trial, not in a motion to exclude testimony.[24]   As the Federal Circuit has explained, "[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."[25]

The truth is that BigPipe and Audience Symbols are not "minor improvements" at all— for example, Facebook itself refers to BigPipe as one of its "secret weapons[.]"[26]   In his original expert report Mr. Malackowski relied on Rembrandt's technical expert Dr. Golbeck, who expressly opined in her expert report that, ███████████████████████████████

████████████████.[27]   This alone creates a factual dispute that precludes granting Facebook's motion.[28]

---

[24]   *See, e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) (a party's "quarrel with the facts" an expert used "goes to the weight, not admissibility, of his opinion."); *ActiveVideo Networks*, 694 F.3d at 1333 (holding that disagreements with the conclusions reached by an expert and the "factual assumptions and considerations underlying those conclusions . . . . go to the weight to be afforded the testimony and not its admissibility").

[25]   *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003); *see also id.* ("We find the Advisory Committee note to Rule 702 instructive in this regard: 'When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'").

[26]   BigPipe: Pipelining web pages for high performance, by Changhao Jiang for Facebook Engineering (Notes), June 4, 2010 ("Site speed is one of the most critical company goals for Facebook.  In 2009, we successfully made Facebook site twice as fast…  Several key innovations from our engineering team made this possible.  In this blog post, I will describe one of the secret weapons we used called BigPipe that underlies this great technology achievement."), attached as Exhibit 6 to the Gopenko Decl.

[27]   Initial Expert Report of Dr. Jennifer Golbeck ("Golbeck Infringement Report") ¶ 555 ██
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████ Malackowski Report § 11.8 ███████████████████

Furthermore, once Facebook made its "minor improvement" argument in Dr. Iansiti's rebuttal to Mr. Malackowski's report, relying on two new surveys conducted by Facebook, Mr. Malackowski submitted a supplemental report in rebuttal to Dr. Iansiti's denigration of BigPipe and Audience Symbols based on these new surveys. Mr. Malackowski's supplemental report demonstrated Facebook's own touting of the importance of BigPipe and Audience Symbols, creating additional factual disputes. Rembrandt's survey expert Mr. Van Liere also submitted a supplemental report criticizing the two new surveys that were the essential basis of Dr. Iansiti's conclusion that ███████████████████████████████████████████ a remarkable conclusion that contradicts Facebook's own representations made outside of this litigation. Because the scheduling order in this case had not provided for supplemental reports, and Rembrandt had not sought permission to file them, Magistrate Judge Jones struck both the Malackowski and Mr. Van Liere supplements.[29] However, Judge Jones also ruled that the substance of both supplements could nevertheless be presented at trial, subject only to the rules of evidence.[30] This only makes sense, as Facebook surely should not be able to advance new surveys, and new arguments based on those surveys, without rebuttal, where Rembrandt's

---

████████████████████████████████ (citing Golbeck Infringement Report)). A copy of the Golbeck Infringement Report was attached as Exhibit 3 to the Batcher Decl.

[28] Notably, although Facebook has moved to exclude other aspects of Dr. Golbeck's opinions, it has not challenged the admissibility of her non-infringing alternative opinion.

[29] *See* D.I. 218.

[30] *See* 09/03/2013 Hrg. Tr. at 13: "So I'm going to grant the motion and strike the reports. Lest there be any question about the effect of that, that ruling, in my view, it does not prevent the two experts from maintaining these opinions in deposition of—or at trial, and they are free to do so subject to the trial judge's application of the Rules of Evidence." A copy of the 09/03/2013 Hearing Transcript is attached as Exhibit 7 to the Gopenko Decl.

experts could not have responded in their original reports to the new material because it did not then exist.

Facebook also advances its non-infringing mobile app delivery systems as evidence supporting its "minor improvements" argument.  Here again, whether these mobile apps are viable non-infringing alternatives for BigPipe in a desktop system is a fact issue, and is dealt with by Dr. Golbeck in her opening expert report in Section XII(A)(4).

### D.      Inclusion of the Convoyed Features Was Proper

Facebook criticizes Mr. Malackowski's inclusion of the convoyed features in his analysis.  But because these features depend upon the patented features for their operation they represent additional ways in which the patented features drive user demand.  Their inclusion is consistent with the law relating to the concept of convoyed products.

Facebook does not dispute the law of convoyed features.  To the contrary, Facebook concedes that under the Federal Circuit's decision in *Rite-Hite* unpatented features can be considered "convoyed" with the patented components—and thus properly included in the royalty base—if the patented and unpatented features "function together to achieve one result" or could not "effectively have been used independently of each other."[31]  Facebook's only dispute is whether the convoyed features Mr. Malackowski relied upon do in fact meet this test.  But this is just the type of factual dispute that goes "to the weight to be afforded the testimony and not its admissibility."[32]

Moreover, Facebook's entire argument on the convoyed features rests on its flawed premise that the patented features in this case are BigPipe and the Audience Symbol.  But as

---

[31]   Facebook Br. at 15 (quoting *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995)).

[32]   *ActiveVideo Networks*, 694 F.3d at 1333.

explained above, this is simply not the case. The patented accused features are News Feed and Timeline, as these are what infringe the patents, not BigPipe and the Audience Symbol standing alone. And the convoyed features do "function together" with News Feed and Timeline and cannot be used independently of them. Indeed, Facebook admits in its brief that the convoyed features are each "displayed on News Feed and Timeline"[33] and Facebook does not challenge the testimony of Frederic Bien, an expert on Facebook marketing, that the convoyed features are "inextricably linked" with News Feed and Timeline.[34]

### E. Facebook's Other Criticisms also Go to Weight, not Admissibility

Facebook raises several other factual disputes concerning Mr. Malackowski's reliance on the survey evidence, all of which go to weight rather than admissibility and should be resolved at trial.[35] In fact, the Fourth Circuit has affirmed that survey evidence generally should not be excluded, explaining that in all but rare occasions methodological objections to surveys "are properly addressed by the trier of fact."[36]

---

[33]   Facebook Br. at 15.

[34]   Bien Report ¶¶ 260-264.

[35]   *ActiveVideo Networks*, 694 F.3d at 1333.

[36]   *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 163 (4th Cir. 2012), as amended (May 9, 2012) (quoting *PBM Prods., LLC v. Mead Johnson & Co*., 639 F.3d 111, 123 (4th Cir. 2011) (internal quotation marks omitted); *see also PBM Prods.*, 639 F.3d at 123 (rejecting argument that district court abused its discretion in Lanham Act case by admitting expert testimony and survey where the experts allegedly had "surveyed the wrong universe of respondents"); McCarthy, Trademarks and Unfair Competition § 32:170 (4th ed. 2012), *cited in Belk*, 679 F.3d at 163 ("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence."); *Micro Chem., Inc. v. Lextron, Inc*., 317 F.3d 1387, 1390-91 (Fed. Cir. 2003) ("Whether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit.").

Facebook argues that Mr. Malackowski erred in assuming a "one-to-one relationship" between the survey results and the degree to which the patented and convoyed features drive advertising revenue.  But Mr. Malackowski never said there was a precise mathematical relationship, only that the degree to which those features, when compared to the unpatented features, drive user and advertiser demand for the Facebook system is a reasonably sensible measure of how much of the total revenue is attributable to the patented features.  The rationale, as discussed above, is that the patented and convoyed features drive a certain portion of the user demand for Facebook, and thus the size of the user population of Facebook, the foundation of all Facebook advertising revenue.  A precise mathematical relationship is neither required nor possible.[37]  In fact, in *LaserDynamics*, the Federal Circuit reiterated that apportionment is appropriate even when it has to be derived from non-exact data, and cautioned that it is the jury that is "entitled to weigh . . . competing views" of the appropriate value to attribute to the patented features.[38]

Facebook also argues that the surveys measured only the "importance" of the various features to users and advertisers.  But this argument overlooks the precise nature of the survey questions, which expressly asked not about importance in the abstract but importance as a reason for using or advertising on Facebook.[39]  The questions thus properly addressed the relevant

---

[37]   *See, e.g.*, *Lucent Techs.*, 580 F.3d at 1325 ("[A]ny reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'") (internal citations omitted); *Standard Havens Prods., Inc. v. Gencor Indus., Inc*., 953 F.2d 1360, 1374 (Fed. Cir. 1991) (holding that the amount of damages "need not be proven with unerring precision") (internal citations and quotations omitted).

[38]   *LaserDynamics*, 694 F.3d at 70.

[39]   Expert Report of Gabriel M. Gelb at 5, 29-42 ("Considering only these five features, which is Most Important and which is Least Important to you when ***deciding to advertise on Facebook.***"), attached as Exhibit 8 to the Gopenko Decl.; Expert Report of Kent D. Van Liere ¶ 20 and Exhibit D ("[W]e would like to learn more about the relative importance of

issues—why users use Facebook and why advertisers advertise on Facebook, i.e., what drives their demand for Facebook.

Facebook also argues that the list of features used in the surveys was incomplete.  But Dr. Bien concluded that the list was a "reasonably comprehensive list of the important features on Facebook."[40]  This disputed fact is not a basis for excluding Mr. Malackowski's testimony. Further, whether the list was complete or not needs to be judged in the context of its purpose. The purpose of the list was for comparing the patented and unpatented features of the product itself.  It is the features of the product itself that are to be compared under *Uniloc*.[41]  Thus, it would not have been appropriate to include topics such as how Facebook markets to, or interacts with, advertisers, as Facebook suggests should have been done.  Nor should sub-elements of features, such as BigPipe or Audience Symbols, have been included, for the same reasons as discussed above. Not only are these sub-elements accounted for indirectly through the tested features, of which they are components, but these elements are not "patent practicing units" as called for in *LaserDynamics*.[42]

---

the various Facebook features as to why you use Facebook.  Below is a list of different Facebook features.  Please divide 100 points across the list of features to indicate the relative importance of each feature as ***a reason for why you use Facebook***."), attached as Exhibit 9 to the Gopenko Decl.; Expert Report of Jerry Wind on Consumers' Perceptions of the Importance of the Various Features of Facebook at 3, 11 ("Please review all the features you told us you use and tell us how important each feature is in ***making you want to use Facebook.***"), attached as Exhibit 10 to the Gopenko Decl.

[40]  Bien Report ¶ 143 ("It is my opinion that the list of features, described below and attached as Exhibit D represents a reasonably comprehensive list of the important features on Facebook.").

[41]  *Supra*, p. 2.

[42]  *LaserDynamics*, 694 F.3d at 67 ("[R]oyalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit.") (citing *Cornell Univ.*, 609 F. Supp. 2d at 283, 287-88).

Finally, Facebook argues that the surveys failed to consider the "network effect"--"the value of the sheer size of…the Facebook user community."  But the surveys measured the extent to which the infringing Facebook features were drivers of that "sheer size" and thus the "network effect."  Rather than being an infringing feature itself, the network effect is a result of the infringing features.

## III.   THE RATE METHODOLOGY WAS CORRECT

Facebook also criticizes Mr. Malackowski's rate analysis on multiple grounds.  Here again, Facebook's arguments fall far short of establishing inadmissibility.

Mr. Malackowski first determined the upper and lower bounds of a range within which a reasonable royalty rate should fall.  He then considered the *Georgia Pacific* factors as they applied to the specific facts of this case, and his experience and judgment, to conclude that the hypothetical negotiation would likely have ended up at a rate 5% for a license under either the '316 or '362 patents and 6% for a license under both the '316 and '362 patents.  Each step in this methodology was carried out consistent with acceptable practice.[43]

### A.   The Lower Bound of the Range Was Properly Based on the Patent Owner's Own Transactions Relating to the Patented Technology

Mr. Malackowski looked to the transactions of the original patent owner, Aduna, to establish the lower bound of the range.  Facebook argues that Aduna's transactions were "incomparable" to the hypothetical license and so cannot be used in the rate analysis.  But

---

[43] *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003) ("Furthermore, we cannot say that Fiorito's testimony was the product of an unreliable methodology.  This court has 'endorsed the conceptual framework of a hypothetical negotiation between patentee and infringer as a means for determining a reasonable royalty.'  Factors relevant in a reasonable royalty determination using this method include those set out in *Georgia Pacific*. Fiorito properly applied the accepted *Georgia Pacific* methodology to Micro Chemical's version of the disputed facts, explaining the effect each factor would have on a negotiated royalty.") (internal citations omitted).

16

Aduna's transactions, which dealt with the identical technology covered by the patents in suit, are the best and most comparable evidence of what royalty rate would have been reasonable.

The Aduna transactions concerned a software product called Zpad. Rembrandt's expert Dr. Golbeck explained that Zpad practiced the claims of the Rembrandt patents. Facebook has not challenged Dr. Golbeck's analysis and appears to concede that the Zpad transactions are technologically comparable—they are actually identical—to the patented inventions.

The main Aduna transactions at issue are agreements with a sporting goods company called Hink Sport and a university called Vrije Universiteit Amsterdam. Under these agreements Aduna provided Hink Sport and Vrije Universiteit Amsterdam with the operational Zpad software and a license to use the software, along with website hosting services, for a royalty of approximately forty-five cents per user.[44] Mr. Malackowski applied that royalty to "historical Facebook user and revenue data to arrive at a running royalty rate that captures the essence of the Aduna licensing terms."[45] This analysis resulted in a royalty rate of ███[46]

Mr. Malackowski recognized that these Aduna agreements were not patent licenses, because they were entered into before the patents in suit were granted, and he conducted an analysis to account for that difference. He studied publically available agreements and relevant literature in the software industry and calculated the relative value of a bare patent license

---

[44] Malackowski Report § 11.3.1 ("The license fee [for Hink Sport] was 1 Dutch Guilder per unique visitor to the Megastore Zpad site per year, with a minimum license fee of 50,000 Guilders per year (prorated monthly based on the current estimate of the annual license fee)."); § 11.3.2 ("The license fee [for Vrije Universiteit] was 1 Dutch Guilder per user per year, with a minimum 5,000 Dutch Guilder per year."); § 11.3.2 ("As of March 3, 2000, 1 Dutch Guilder was $0.44 U.S. Dollars."); *see also* Malackowski Appendix 6.1, attached as Exhibit 14 to the Gopenko Decl.

[45] Malackowski Report § 11.10.

[46] *Id.*

compared to a license for software and related technology.  He then applied that relative value to the ███ previously calculated, as a "conversion factor from the worth of a license for software and related technology to a bare patent license."[47]  This analysis yielded a lower bound royalty rate of 2.3%.[48]

    While Facebook is entitled to cross examine Mr. Malackowski about this analysis, there is no basis for preventing Mr. Malackowski from presenting it.  Although there are economic differences between the executed Aduna licenses and a hypothetical patent license between Aduna and Facebook, the Aduna licenses are by far the most comparable transactions that exist and Mr. Malackowski analyzed and accounted for the differences.  He even addressed Facebook's argument that Aduna licenses were considered failures, citing to testimony by a colleague of the late inventor noting that Zpad was an invention "ahead of its time."[49]

    Relevant here is the analysis in *Interwoven, Inc. v. Vertical Systems*, where the agreements used by the expert as comparables were the best available evidence despite both technological and economic differences:

> Interwoven goes on to argue that Vertical cannot rely on the Basix1 Agreements to derive a reasonable royalty rate, as the Agreements are not sufficiently compared either technologically or economically.
>
> *     *     *
>
> *LaserDyanimcs*, which holds that a reasonable royalty based on "loose or vague" comparisons to existing licenses must be excluded is distinguishable from the

---

[47]   Malackowski Report § 11.10.

[48]   *Id.*

[49]   Malackowski Report § 4 ("As Frank Van Harmelen, Ph.D., explains, the Zpad software failed because it was 'ahead of its time' and its customers and potential customers 'failed to grasp' the idea of a social medium that created communities, instead continuing to view the web as a read only medium." (citing deposition testimony of Frank Van Harmelen, Ph.D., June 24, 2013, pages 63-65, attached as Exhibit 11 to the Gopenko Decl.)).

present case.  694 F.3d at 79.  In *LaserDynamics* the expert had ignored many licenses expressly for the patent in issue in favor of a license somewhat removed from the relevant technology.  *Id.* at 80.  Here, by contrast, there is no evidence that any license for the exact patents-in-suit was negotiated but not considered.  Rather, Gemini based his conclusions on what he thought to be the best evidence available to him.  These licensing agreements were entered during the same time period and dealt with the technology using the patents-in-suit.  Thus, relying on the Basix1 Agreements as a starting point for determining a reasonable royalty rate was not precluded as a matter of law.

*  *  *

These comparisons indicate Gemini underwent a thorough analysis of the factors involved in connection with each license agreement.  Any concern as to the degree of comparability between an existing and hypothetical license may be addressed through cross-examination.  *ActiveVideo Networks v. Verizon Communications*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).[50]

As in *Interwoven*, Mr. Malackowski has conducted a thorough analysis of the best licensing evidence available to him.  Facebook's concerns about the degree of comparability between that evidence and the hypothetical license are best addressed through cross-examination.

Facebook argues that Mr. Malackowski should have looked primarily to Facebook's licensing history in establishing his royalty rate, yet faults him for using Aduna's licensing history to establish the lower bound of his royalty rate range.  But Facebook's expert Dr. Iansiti flatly admits that Facebook's licensing history is not comparable: ██████████████████

██████████████████,"[51]

---

[50]  *Interwoven, Inc. v. Vertical Computer Sys.*, 2013 U.S. Dist. LEXIS 100790, at *36-38 (N.D. Cal. July 18, 2013); *see also Internet Machs. LLC v. Alienware Corp.*, 2013 WL 4056282, at *14 (E.D. Tex. 2013) (holding that the plaintiff's expert properly relied upon disputed license agreements when "although the licenses did not directly cover the patented technology" they "provide valuable and relevant information about the value of the patented technology" and accordingly were "clearly linked to the economic demand for the claimed technology." (quoting *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 873 (Fed. Cir. 2010))).

[51]  Iansiti Report at 42.

Here, Mr. Malackowski relied on licenses to software embodying the patents-in-suit, and then used a credible economic approach to account for economic differences.  Facebook may disagree with the particulars of Mr. Malackowski's analysis, but its argument goes to the weight, rather than the admissibility, of the Mr. Malackowski's testimony and is a proper area of cross-examination.

**B.      The Upper Bound Simply Reflects Facebook's Entire Surplus Attributable to the Inventions, to Be Divided at the Hypothetical Negotiation**

Facebook apparently misunderstands the purpose of Mr. Malackowski's upper bound. The upper bound was calculated by using the survey results to allocate Facebook's total profit between the patented and unpatented features, just as in the allocation of total revenue.[52]  Mr. Malackowski never suggested that Rembrandt would be entitled to all of the allocated profit, or anything close to it, as a reasonable royalty.

This is in fact a conservative calculation of the surplus generated by the patented features. As Christopher Plambeck, Facebook's Director of Monetization Analytics, stated in his deposition, ██████████████████████████████████████████████████

████████████████████████████████████████[53]  Thus, it is arguable that 100% of Facebook's total profits are therefore attributable to the infringing features and would be subject to allocation between Aduna and Facebook in the hypothetical negotiation.  By apportioning Facebook's operating profits based on the surveys, Mr. Malackowski made a conservative calculation of the profit over which the parties would negotiate a rate.

Facebook's criticism of the upper bound thus misses the point.

---

[52]   Malackowski Report § 11.9.13.

[53]   Deposition testimony of Christopher Plambeck, Director of Monetization Analytics, Facebook, Inc., May 14, 2013, pages 97:17–99:19, attached as Exhibit 12 to the Gopenko Decl.

### C.      The 5-6% Royalty Conclusion Was Reasonably Based on the Evidence

Facebook argues that Mr. Malackowski's ultimate conclusion that a reasonable royalty rate would be 5% based on one patent or 6% based on both patents was unsupported speculation. But in fact the 5-6% conclusion was based on detailed analysis of the facts of the case as they bear on the *Georgia Pacific* factors.

Facebook seems to suggest that somehow the reasonable royalty rate can be computed with mathematical precision. But the *Georgia Pacific* factors are all directional guides and themselves lack any specific quantifications. The best any expert can do is to consider all the directional factors, consider the closest comparable licenses (if any) and how they differ from the hypothetical license, and then use his or her experience and judgment to opine as to the most reasonable rate that could have been used in the hypothetical negotiation.[54] That is exactly what Mr. Malackowski did. To the extent that Facebook disagrees with Mr. Malackowski's conclusion, it can cross-examine him at trial and introduce expert testimony of its own.[55]

---

[54]  "The *Georgia Pacific* factors contain qualitative factors—such as 'the opinion testimony of qualified experts' and 'the commercial relationship between the licensor and licensee'—that do not lend themselves to mathematical precision." *Veritas Operating Corp. v. Microsoft Corp.*, 2008 U.S. Dist. LEXIS 112135, *19-20 (W.D. Wash. Feb. 26, 2008) (finding that "Veritas' expert has taken into account the relevant factors and [the Court] will not bar his testimony on grounds that he failed to perform a proper quantitative analysis in reaching a reasonable royalty calculation."); *Ergotron, Inc. v. Rubbermaid Commercial Prods., LLC*, 2012 WL 3733578, at *15 (D. Minn. 2012) ("[T]he *Georgia Pacific* factors are multitudinous and not every factor is amenable to precise numerical analysis. Therefore, in such circumstances, exacting precision is impossible and not fatal to Cobb's opinion. Any imprecision goes to the weight and not admissibility of Cobb's opinion."). It follows that while damages "may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

[55]  *ActiveVideo Networks*, 694 F.3d at 1333 ("The degree of comparability of the Gemstar and Grande license agreements as well as any failure on the part of ActiveVideo's expert to

Facebook also suggests that simply because Mr. Malackowski rendered his royalty-rate opinion based in part on his own substantial experiences (applied to the facts of this case), his testimony should be struck as unreliable.  This same argument was rejected in *VS Technologies, LLC v. Twitter, Inc.*—and it should be rejected here too.  In *VS Technologies*, the damages expert based his royalty-rate opinion on documents and testimony provided by the defendant along with his own vast licensing experience.[56]  The defendant argued that the expert's opinion was based only on his own experience and failed to offer any logical connection between his conclusion and his prior analysis.[57]  But the court rejected that argument, finding it permissible for the damages expert to base his opinion upon his experience as applied to the facts of the case and finding that his testimony rested upon a factual basis sufficient to support his conclusions:

> While it is certainly the case that "a court should disregard expert opinion if it is mere speculation, not supported by facts," *Anderson v. Nat'l R.R. Passenger Corp.*, 866 F.Supp. 937, 943 (E.D. Va. 1994), *aff'd.* 74 F.3d 1230 (4th Cir.1996), Evans' testimony rests upon a sufficient factual basis to support his conclusion. As VS Technologies asserts, Evans bases his opinion upon his experience as applied to the facts of the case.  Evans has over forty (40) years of experience in the area of the licensing of patents, trademarks and technologies.  In those forty (40) years, Evans estimates that he has "has been involved in the negotiation of more than 400 licenses, as licensor or as licensee."  Evans Report at ¶ 3. Accordingly, Evans possesses the requisite knowledge, skill, experience, training and education to determine the relevant range for likely revenue sharing between a willing licensor and licensee and apply it to the facts of this case.[58]

---

control for certain variables are factual issues best addressed by cross examination and not by exclusion.").

[56]   *VS Techs., LLC v. Twitter, Inc.*, 2011 U.S. Dist. LEXIS 114975, at *18 (E.D. Va. Oct. 4, 2011) ("Evans bases his opinion upon his experience as applied to the facts of the case.").

[57]   *Id.* at *10-12 ("Twitter requests that this Court exclude Evans' testimony on the basis that it is mere 'speculation and guesswork, bootstrapped with his own *ipse dixit*.'") (internal citations omitted).

[58]   *Id.* at *17-18.

So too here.  Like the damages expert in *VS Technologies*, Mr. Malackowski has a significant amount of licensing experience.[59]  And like the damages expert in *VS Technologies*, Mr. Malackowski rendered his royalty-rate opinion based on that experience as applied to the specific facts of this case, including the numerous Facebook documents and Facebook deposition testimony that Mr. Malackowski referenced in the royalty-rate analysis section of his expert report.[60]

In addition, Mr. Malackowski's detailed and fact-specific analysis was not only reasonable, but also objective.  In going through the *Georgia Pacific* factors he concluded that five of them favored neither party and four of them favored Facebook.  He considered all of the evidence that tended to favor Facebook's negotiating position in the hypothetical negotiation, including Facebook's pre-infringement revenue, its control and optimization of ad impressions, its use of polling, and the Facebook brand.[61]

Facebook argues that historically it has not agreed to requiring royalty licenses.  But as the Federal Circuit said in *Rite-Hite*, "what an infringer would prefer to pay is not the test for damages."[62]

Facebook's reliance on *ePlus* is misplaced.[63] There the court faulted the patentee's expert for relying on a flawed baseline royalty rate range, which was based on a "dubious royalty base" and cherry-picked settlement agreements that had "minimal, if any, probative value" and which

---

[59]   *See, e.g.*, Malackowski Report § 1.1 and Appendix 1 (curriculum vitae), attached as Exhibit 13 to the Gopenko Decl.

[60]   Malackowski Report § 11.

[61]   Malackowski Report § 11.9.

[62]   *Rite-Hite*, 56 F.3d at 1555.

[63]   *ePlus Inc. v. Lawson Software Inc.*, 764 F. Supp. 2d 807 (E.D. Va. 2001).

ignored additional settlement agreements which would have significantly lowered the calculated range.[64] And the damages expert ultimately opined that a rate that "double[d] the royalty rate arrived at in the hypothetical negotiation" would be appropriate and failed to explain how the application of the *Georgia Pacific* factors led to such a dramatic increase.[65] Here Mr. Malackowski selected a rate well within a properly constructed range, and did so based on a careful and detailed application of the *Georgia Pacific* factors, noting that many of them favored the licensee Facebook.

Finally, it is absurd for Facebook to compare what Mr. Malackowski did with the arbitrary "rule of thumb" analyses rejected in *Suffolk Tech* (Nash Bargaining Solution)[66] and

---

[64]  *Id.* at 813-15.

[65]  *Id.* at 815.

[66]  *Suffolk Techs. LLC v. Aol Inc.*, 2013 U.S. Dist. LEXIS 64630, 4-6 (E.D. Va. Apr. 12, 2013). There, this Court stated:

> [T]he hypothetical negotiation conducted by Weinstein, based on the Nash Bargaining Solution ("NBS"), does not appear to be tied to the facts of this case. Instead, Weinstein appears to []conclude summarily that the result of this hypothetical negotiation would be a "50/50 split of the incremental profits attributable to the patent-in-suit." . . . . Weinstein's damages opinion is, in essence, (i) the application of *Georgia Pacific* factors, followed by (ii) the application of a 50/50 split, derived from the NBS.

> Put simply, Weinstein's damages opinion is not meaningfully distinguishable from the damages opinion rejected in *Uniloc*. There, the expert first applied a theoretical rule of thumb and then applied the *Georgia Pacific* factors; here, Weinstein first applied the *Georgia Pacific* factors and then applied a theoretical rule of thumb, albeit one clothed as the NBS. The order in which the *Georgia Pacific* factors are applied does not change the fundamental and fatal flow of both calculations, namely that the hypothetical rule of thumb was not tied to the facts of the case. *See Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) ("The Nash bargaining solution would invite a miscarriage of justice by clothing a fifty-percent assumption in an impenetrable facade of mathematics."). Accordingly, [] Weinstein's damages opinion must be excluded pursuant to Rule 702, Fed. R. Evid., and *Daubert*.

*Id.*

24

*Uniloc* (25% rule).[67]  Those methodologies were wholly untethered to the specific facts of the cases.  Mr. Malackowski's method is rooted in the relevant law and specifically tied to the facts of this case.

For these reasons, Facebook's challenges to Mr. Malackowski's royalty rate analysis are at most appropriate for cross-examination, and do not warrant exclusion.

## IV.   CONCLUSION

For the reasons above, Mr. Malackowski's testimony should be admitted at trial.

---

[67]  *Uniloc*, 632 F.3d at 1315 ("This court now holds as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation.  Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue.").

Respectfully submitted,

FISH & RICHARDSON P.C.

Dated:  September 27, 2013

By:   /s/  Daniel R. Gopenko
    Ahmed J. Davis (Va. Bar No. 43982)
    Daniel R. Gopenko (Va. Bar No. 83932)
    1425 K Street N.W., 11th Floor
    Washington, D.C. 20005
    Telephone: (202) 783-5070
    Facsimile:  (202) 783-2231

    Thomas M. Melsheimer
    Rex A. Mann
    1717 Main Street, Suite 5000
    Dallas, Texas 75201
    Telephone:  (214) 747-5070
    Facsimile:  (214) 747-2091

    Robert E. Hillman
    Lawrence K. Kolodney
    One Marina Park Drive
    Boston, MA 02110
    Telephone: (617) 542-5070
    Facsimile: (617) 542-8906

    John S. Goetz
    601 Lexington Ave., 52nd Floor
    New York, NY 10022
    Telephone:  (212) 765-5070
    Facsimile: (212) 258-2291

*Counsel for Plaintiff*
*Rembrandt Social Media LP*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of September, 2013, I will electronically file the foregoing **REMBRANDT'S OPPOSITION TO FACEBOOK'S MOTION TO EXCLUDE THE TESTIMONY OF JAMES E. MALACKOWSKI** with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

Phillip E. Morton
Stephen R. Smith
Jonathan G. Graves
**Cooley LLP**
Reston Town Center
11951 Freedom Drive
Reston, VA 20190
Telephone: 703-456-8000
Facsimile:  703-456-8100

Michael G. Rhodes
**Cooley LLP**
4401 Eastgate Mall
San Diego, CA 92121
Telephone:  858-550-6000
Facsimile:  858-550-6420

Mark R. Weinstein
Heidi Lyn Keefe
**Cooley LLP**
5 Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94304
Telephone:  650-843-5000
Facsimile:  650-849-7400

*Counsel for Defendant Facebook, Inc.*

_____
      */s/ Daniel R. Gopenko*
         Daniel R. Gopenko