IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| REMBRANDT SOCIAL MEDIA, LP, | ) | REDACTED |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-158 |
| | ) | |
| FACEBOOK, INC., | ) | |
| Defendant. | ) | |
| | ) | |

FILED
DEC - 3 2013
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

At issue in this patent infringement suit is whether the opinion of plaintiff's expert, James Malackowski, satisfies the requirements of Rule 702, Fed. R. Evid., and *Daubert*.[1] For the reasons that follow, plaintiff's proffered expert testimony on damages fails to qualify as reliable expert testimony under Rule 702 and *Daubert* and must be excluded.

I.

Plaintiff, Rembrandt Social Media, LP ("Rembrandt"), a non-producing Virginia limited partnership with its principal place of business in Pennsylvania, is the owner by assignment of the two patents at issue: U.S. Patent No. 6,415,316 ("the '316 patent") and U.S. Patent No. 6,289,362 ("the '362 patent").[2] Rembrandt alleges that defendant, Facebook, Inc. ("Facebook"), a Delaware corporation with its headquarters in California,[3] infringed both patents by the use of its widely-used Facebook website.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[2] The inventor assigned the patents to Aldministrator Nederland, B.V. (Aduna), who thereafter assigned the patents to Rembrandt in 2012.

1

## The '316 Patent

The '316 patent, issued July 2, 2002, is entitled "Method and Apparatus for Implementing a Web Page Diary." In the words of the patent's abstract, the '316 patent describes a "method and apparatus to create a 'diary' containing multimedia references to contents of websites." Rembrandt alleges Facebook directly infringes claim 4 of the '316 patent, which depends from claim 1, and claims 20 and 26, both of which depend from claim 17.

Claim 1 of the '316 patent describes a method for organizing information and displaying this information on the diary page.[4] In essence, the method of claim 1 involves a server sending a diary program to the user's web browser, along with content data, a page design specifying the presentation of the content data, and configuration information for controlling the way in which the diary page will be displayed, including privacy level information—namely to whom the diary

---

[3] AddThis, Inc., originally named as a second defendant, was voluntarily dismissed. *Rembrandt Social Media, LP v. Facebook, Inc.*, 1:13-cv-158 (E.D. Va. Aug. 12, 2013) (Order).

[4] Claim 1 claims: "A method of organizing information for display, comprising:

    (a) sending from a diary server to a user system, a diary program capable of being executed by a browser in the user system;

    (b) sending diary information from the diary server to the user system, the information comprising content data including an associated time, a page design to specify the presentation of the content data, and configuration information for controlling behavior of a cohesive diary page, the configuration information including privacy level information;

    (c) assembling the cohesive diary page by dynamically combining the content data and the page design in accordance with the configuration information for the cohesive diary page to be displayed by the diary program running in the browser;

    (d) receiving by the diary server at least one request for at least one change concerning the diary information, from the diary program in the user system; and

    (e) sending, by the diary server to the user system, new diary information for changing the cohesive diary page."

page will be displayed. Once in the user's system, the diary program generates and assembles the cohesive diary page by dynamically combining the content data received from the server with the web page design, also received from the server, according to the configuration information. The cohesive diary page thus assembled is then displayed by the diary program in the user's web browser in a manner consistent with the privacy level information. Claim 4, the allegedly infringed claim, depends from claim 1 and simply adds that "[t]he new diary information is for changing content of the diary page without changing a general appearance of the diary page."

Allegedly infringed claims 20[5] and 26[6] of the '316 patent are dependent from claim 17, which describes an apparatus, *i.e.*, a computer software program, that is used essentially to accomplish claims 1 and 20.[7]

---

[5] Claim 20 claims: "The apparatus of claim 18, wherein the cover includes advertisements not requested by a user." Claim 18, in turn, depends on the apparatus of claim 17—the program that displays content of a diary page by the diary program in accordance with a cover for a diary.

[6] Claim 26 claims: "The apparatus of claim 17 further comprising:

(1) a portion configured to receive, from the diary server, new diary information;

(2) a portion configured to change content of the diary page without changing a general appearance of the diary page, in accordance with the new diary information."

[7] Claim 17 claims: "An apparatus that displays and organizes information, comprising:

(1) a software portion configured to receive, by a user system from the diary server, a diary program capable of being run by a browser in the user system;

(2) a software portion configured to receive, by the user system from the diary server, diary information comprising content data including an associated time, a page design to specify the presentation of the content data, and configuration information for controlling behavior of a cohesive diary page, the configuration information including privacy level information;

## The '362 Patent

The '362 patent, entitled "System and Method for Generating, Transferring, and Using an Annotated Universal Address," describes a method and computer program product for displaying content on a web page. Rembrandt asserts that Facebook infringes claims 8,[8] 20,[9] and 21[10] of the

---

(3) a software portion configured to assemble the cohesive diary page by dynamically combining the content data and the page design in accordance with the configuration information;

(4) a software portion configured to display the cohesive diary page, by the diary program running in the browser."

[8] Claim 8 claims: "The method of claim 1 wherein the annotation further comprises: at least one content provider authored restriction concerning subsequent presentation of the object."

[9] Claim 20 claims: "A computer program product, on a computer readable medium, the computer program product comprising:

(1) program code for receiving from a client a request for access to a content object;

(2) program code for identifying, responsive to the request of the client, an annotated universal address (AUA) having a universal address identifying a location of the content object and having an annotation authored by a content provider for controlling an aspect of a presentation of the object, the AUA being present in an AUA database containing at least one AUA;

(3) program code for identifying, responsive to the request of the client, a presentation context for controlling presentation behavior of the object;

(4) program code for transmitting to the client the presentation context, the AUA and an applet for dynamically generating a page definition for the presentation of the object, the page definition being generated from the presentation context and the AUA."

[10] Claim 21 claims: "A computer program product, on a computer readable medium, the computer program product comprising:

(1) program code for transmitting a request to access a content object;

(2) program code for receiving, responsive to the request, an annotated universal address (AUA) having a universal address identifying a location of the content object and including an annotation authored by a content provider for controlling an aspect of a presentation of the object;

4

'362 patent. Claim 8 is a dependent claim that depends from independent claim 1,[11] and claims 20 and 21 are independent claims. Claims 1 and 20 are substantially similar and are essentially directed at a method and computer program product, respectively, for displaying a content object through a page definition generated by an "applet," or computer program. The '362 patent, similar to the '316 patent, describes a method of using a computer program, running on the user's own browser, that generates a complete web page for that user, based on content, page definitions, and presentation information sent from the third-party server. More particularly, the method and computer program may be described as follows: first, the user sends a request for access to some "object" of content. In response to that request, a program identifies the "annotated universal address" (AUA) for the location of that content object, identifies how that content object should be presented on the page (presentation context), and sends to the client the

---

(3) program code for receiving, responsive to the request, a presentation context for controlling presentation behavior of the object;

(4) program code for dynamically generating a page definition for the presentation of the object, using the presentation context and the AUA;

(5) program code for retrieving the object specified by the universal address."

[11] Claim 1 claims: "A computer-based method, comprising the steps of:

(1) receiving from a client a request for access to a content object;

(2) responsive to the request of the client, identifying an annotated universal address (AUA) having a universal address identifying a location of the content object and having an annotation authored by a content provider for controlling an aspect of a presentation of the object, the AUA being present in an AUA database containing one AUA;

(3) responsive to the request of the client, identifying a presentation context for controlling ion [sic] behavior of the object;

(4) transmitting to the client the presentation context, the AUA and an applet for dynamically generating a page definition for the presentation of the object, the page definition being generated from the presentation context and the AUA."

AUA, presentation context, and applet. The "applet" at issue in the '362 patent, as described by Rembrandt's expert, Dr. Jennifer Golbeck, is the same software as the "diary program" in the '316 patent. Accordingly, the applet, like the diary program, dynamically combines data with a page design, both received from the server, according to a certain presentation context.

### The Facebook Website

The putatively infringing website, Facebook, is a free social networking service delivered through a number of platforms, including its web address, <http://www.facebook.com>. The Facebook website runs in the user's web browser. The Facebook website includes a number of web pages allowing Facebook's users to share information with each other. For example, when a user logs into Facebook, he or she sees the "News Feed" web page, introduced in 2006, which displays recent activities that have occurred on Facebook and may be relevant or interesting to the viewing user. Such activities are called "stories" and may include the recent activity of the user's friends—when that user's friends share photos or video, recommend third party web pages, or engage in other activities. Each Facebook user also has a "Timeline," which shows basic information about that particular user, along with actions taken by or directed toward that user—including, for example, photos and video uploaded by that user or webpages shared with that user by the user's friends. Timeline, introduced in 2011, was preceded by a web page called "The Wall," which provided a similar functionality. Facebook allows users to upload, organize, and store photos and video using a functionality called "Photo/Video Sharing," which can be viewed by other users based on the privacy controls set by the user who uploaded the photos or video. Finally, Facebook allows users to create pages for businesses ("Pages"), as well as pages for groups ("Groups") relating to common associations or interests.

In 2009, Facebook introduced two new features to its website: BigPipe and Audience Symbol. Rembrandt's expert, Dr. Golbeck, admitted that the alleged infringement in this case is attributable to the introduction of BigPipe and Audience Symbol in 2009, and that Facebook does not infringe without BigPipe and Audience Symbol.

BigPipe, introduced in Fall 2009, is a web page acceleration and optimization computer program developed by Facebook to increase the speed at which certain web pages are delivered from Facebook's servers to the user's web browser. BigPipe takes a web page and divides it into portions known as "pagelets" using a certain piece of computer code[12] to specify each pagelet. Each pagelet represents a portion of a web page on Facebook. For each pagelet, Facebook's server generates code that describes the format of the pagelet, and sends that code over the internet to the user's web browser. Facebook's server sends the BigPipe program to the user's computer, where it runs in the user's web browser. BigPipe first ensures that certain necessary resources are loaded, and then passes the pagelet code from Facebook's server to the user's web browser, where the pagelet is processed and displayed by the user's web browser. This is accomplished with a single command, which passes the pagelet code obtained from the server to the browser. The user's browser then downloads and processes any additional files needed to display the pagelet fully so that it may display the pagelet for the user. This process is repeated for each pagelet, until the entire web page is displayed in the user's web browser. On average, BigPipe allows webpages to be delivered to users one second faster than Facebook's earlier webpage delivery method. Rembrandt alleges that this technology—the BigPipe script—is the alleged "diary program" recited in claim 1 of the '316 patent, and that BigPipe performs the

---

[12] Hypertext Markup Language, or "HTML."

7

assembly step of "assembling the cohesive diary page by dynamically combining the content data and the page design" recited in claim 17 of that patent.

Audience Symbol, introduced in June 2009, is a small icon displayed next to stories on various webpages on Facebook's website. The symbol signifies the third-party users, or "audience," allowed to view a particular story. Rembrandt alleges that display of Audience Symbol violates both the '316 and '362 patents.

Rembrandt alleges that Facebook began infringing the '316 and '362 patents by introducing BigPipe and Audience Symbol in 2009. Rembrandt seeks a decree that Facebook has willfully infringed both patents; an award of damages for past infringement; an award of treble damages for past willful infringement; either an award of a permanent injunction to prevent Facebook from infringing the patents, or damages for any future infringement; an award of increased damages pursuant to 35 U.S.C. § 384; a decree that the case is exceptional under 35 U.S.C. § 285; and attorneys' fees and costs. At issue on Facebook's motion to exclude the damages testimony of Rembrandt's expert, James E. Malackowski, is whether the expert used a reliable methodology under Rule 702 and *Daubert*.

## II.

Rembrandt's claim for damages in this case rests entirely on the report of its expert, James E. Malackowski.[13] Mr. Malackowski was asked to determine reasonable royalty damages for Facebook's alleged infringement of the '316 and '362 patents during the period in which the

---

[13] Facebook does not attack the credentials or qualifications of Mr. Malackowski. Mr. Malackowski is the chairman and Chief Executive Officer of Ocean Tomo, LLC, which provides services to its clients related to intellectual property research, investment, and risk management. He has testified as an expert in federal court and before the International Trade Commission over thirty times. He is certified in financial forensics, and he is a Registered Certified Public Accountant.

asserted claims were allegedly infringed—February 2009 to February 2013. In doing so, Mr. Malackowski purported to base this reasonable royalty on a hypothetical negotiation between a willing licensor (the plaintiff) and a willing licensee (the defendant) taking place at the time the infringement commenced. Such a negotiation appropriately assumed that, absent a license, the patent would be infringed.

In order to arrive at the final reasonable royalty, Mr. Malackowski performed the following three steps:

> (1) First, in ascertaining the royalty base, Mr. Malackowski began with the entire revenue stream generated by Facebook from Fall 2009 to February 2013—the time during which the patents were allegedly infringed. Next, he excluded 50% of the total revenue stream, as representing the amount of revenue attributable to the use of Facebook's non-infringing mobile applications. Next, on the basis of customer and advertiser surveys used to rank the importance of twenty-one features of Facebook, he excluded the amount of revenue attributable to features not causing Facebook to infringe.[14] He did not attempt to determine the revenue attributable to BigPipe and Audience Symbol, the features causing Facebook's alleged infringement. Based on these steps, the final royalty base was $█████████, or 65.19% of Facebook's total revenue stream.
>
> (2) Next, Mr. Malackowski determined the royalty rate, or the percentage of the royalty base adequate to compensate Rembrandt for the alleged infringement. First, after examining prior license agreements involving purportedly similar technology, Mr. Malackowski set a "lower bound" of 2.3%, representing the minimum Rembrandt would have been willing to accept in a hypothetical negotiation. Next, by using the percentage of Facebook revenue already determined to be attributable to the alleged infringing and convoyed features, he set an "upper bound" of 21.99%, representing the maximum amount Facebook would have been willing to pay. Mr. Malackowski applied the fifteen *Georgia-Pacific* factors[15] to those bounds to arrive at a final royalty rate of 5-6%.

---

[14] The survey-takers were asked to rank each feature in order of importance. Each feature's weighted percentage of importance purportedly represents the demand for Facebook driven by that feature. The features tested by the three surveys were: News Feed; Timeline; Photo/Video Sharing; Groups; Like (External); Share (External); Like (Internal); Share (Internal); Comment (Internal); Add Photos/Videos; Find Friends; Friend Request; Photo Tagging; Personal Profile; App Center; Messages (Chat/Email); Events/Calendar; Universal Log-In/Registration; Notifications; Targeted Ads; Search for People/Places/Things; and a category termed "Other Features."

(3) Finally, Mr. Malackowski multiplied the royalty rate of 5-6% by the royalty base to arrive at the final reasonable royalty of $■■■■■.

Facebook attacks the royalty base on four grounds: (1) use of Facebook's entire revenue stream as the starting point for the royalty base violated the Entire Market Value Rule ("EMVR"), which allows a patentee to recover "based on sales for an entire apparatus having several features, but only one patented feature" so long as the patentee shows the entire revenue stream is attributable to the infringing features;[16] (2) the expert apportioned revenue based on features not causing the alleged infringement; (3) the surveys determining each feature's worth exclude important revenue-producing features; and (4) the "importance" of features is improperly equated to some percentage of Facebook's revenue. Furthermore, Facebook attacks the royalty rate on three grounds: (1) the upper bound was calculated using the same four

---

[15] *Georgia-Pacific v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970). The fifteen *Georgia-Pacific* factors, which have been adopted by the Federal Circuit, are used by patentees to raise and lower the royalty rate, thereby allowing a patentee to arrive at the final figure that represents the amount a willing licensee would pay to license the patent at issue. Each factor favors the licensor, licensee, or neither. These factors are:

> (1) the royalties received by the patentee for the licensing of the patent in suit; (2) the rates paid by the licensee for use of other patents comparable to the patent in suit; (3) the nature and scope of the license; (4) the licensor's established policy and marketing program to maintain the license; (5) the commercial relationship between the licensor and the licensee; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor; and derivative and convoyed sales; (7) the duration of the patent and license terms; (8) the established profitability, success, and popularity of the product made under the patent; (9) the utility of the patent property over old modes or devices, if any; (10) the character of the patented invention and benefits to those who have used it; (11) the use which the infringer has made of the invention; (12) the selling price or profit customary in that business to allow for use of the invention; (13) the realizable profit creditable to the invention; (14) the opinion testimony of qualified experts; and (15) the amount a licensor and a licensee would have agreed upon at the time the infringement began.

[16] *Tekmax, Inc. v. Exide Corp.*, 215 F.3d 1339 (Fed. Cir. 1999).

10

features as the royalty base; (2) the lower bound was calculated using incomparable licenses; and (3) the final royalty rate was arbitrarily selected. Each argument is addressed below.

## III.

Relevance and reliability are the touchstones of expert testimony admissibility; an expert's testimony is admissible only if it is both relevant and reliable. *Daubert*, 509 U.S. at 591. As Rule 702 makes clear, expert testimony must not only be "based on sufficient facts and data," but it must also be "the product of reliable principles and methods, reliably applied...to the facts of the case." Rule 702, Fed. R. Evid. An expert's subjective beliefs, his speculation, and his hunches are not admissible expert testimony. *Daubert*, 509 U.S. at 599-600.

If a patentee proves infringement, the patentee is entitled to damages adequate to compensate for profits lost due to the infringer's unlawful conduct, "but in no event less than a reasonable royalty" for the use of the patented invention. 35 U.S.C. § 284. Typically, a reasonable royalty is arrived at through the fiction of a "hypothetical negotiation" between the parties at the time infringement commenced; this negotiation assumes the patent is both valid and infringed, and that both parties are willing to enter into the negotiation. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Thus, the reasonable royalty calculation is the product of (1) the royalty base, namely the "revenue pool implicated by the infringement" and (2) the royalty rate, namely the "percentage of that pool adequate to compensate the plaintiff." *Cornell v. Hewlett-Packard Co.*, 609 F.Supp.2d 279, 286 (N.D.N.Y 2009) (Rader, J.). Of course, plaintiff bears the burden of showing that the expert damages testimony is relevant and reliable, that is, that the methodology used to ascertain the royalty base and the royalty rate is reliable and reasonable. *Lucent*, 580 F.3d at 1324. To carry this burden properly, the patentee

must tie the expert testimony on damages to the facts of the case. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).

### A.

Facebook's attack on the royalty base as violating the EMVR misses the mark. Of course, it is undisputed that a patentee cannot base its theory of damages on the value of an entire product when the infringement constitutes only an improvement or component of the product, unless the patentee can show the demand for the product is driven by the improvement or component. But Rembrandt's expert did not use the entire value of Facebook as the royalty base. Mr. Malackowski began his calculation of the royalty base with Facebook's entire revenue, but he then performed two separate apportionments. The EMVR applies when an expert performs no apportionment, instead using the entire value of a product as the royalty base. Application of the EMVR involves applying the royalty rate to the entirety of a product's revenue. *Lucent v. Gateway*, 580 F.3d 1301, 1336 (2009).[17] Accordingly, the EMVR is not implicated here.

### B.

Facebook's second attack is fatal. In calculating the royalty base and rate, Mr. Malackowski failed to apportion Facebook's revenue to BigPipe and Audience Symbol—the features actually causing the alleged infringement. In apportioning revenue based on Timeline, News Feed, Groups, and Photo/Video Sharing, Rembrandt's expert claims damages "far in excess of the contribution of the claimed invention to the market" and thus claims "more than the

---

[17] *See also State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989) ("the entire market value rule [] permits recovery of damages based on the value of the entire apparatus containing several features, where the patent related feature is the basis for customer demand"); *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 656 (Fed. Cir. 1985) ("The district court applied the 'entire market value rule' and declined to apportion the damages between the value of the unpatented and patented features of the machines sold and rented").

12

'damages adequate to compensate for the infringement.'" *Cornell University*, 609 F.Supp.2d at 283-84.

According to the Federal Circuit, a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features," and that evidence must be "reliable and tangible...not conjecture or speculative." *Uniloc*, 632 F.3d at 1318. Where, as here, the accused technologies represent a small improvement to an existing technology, Rembrandt is only entitled to a royalty based on the incremental value provided by that improvement. *Lucent*, 580 F.3d at 1337. Accordingly, the expert must apportion down to the "smallest salable patent-practicing unit" closely tied to the patent at issue. *LaserDynamics v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012). Because the royalty base is meant to represent value gained from the alleged infringement, and thus the amount that a hypothetical licensor would have paid to license the patent, an apportionment including value attributable to more features than just the improvement overcompensates the patentee.

Rembrandt claims that its expert calculated damages, as the Federal Circuit requires, down to the smallest salable patent-practicing unit, and thus apportioning any further is impractical and unnecessary. This argument is unpersuasive. Awarding Rembrandt damages based on the revenue stream attributable to Timeline, News Feed, Groups, and Photo/Video Sharing would award Rembrandt much more than "the use made of the invention by the infringer." *Oracle America, Inc. v. Google Inc.*, 798 F.Supp.2d 1111, 1115 (N.D. Cal. 2011). In order to determine the revenue actually attributable to Facebook's use of the invention, Mr. Malackowski needed to apportion further. Of course, the smallest salable infringing unit must be the starting point for the royalty base, but the Federal Circuit has not held "that no further

apportionment is ever necessary once the smallest salable unit is determined." *Synetix Design Solutions, Inc. v. Synopsys, Inc.*, 2013 WL 4538210 (N.D. Cal. 2013). The smallest salable unit must be closely tied to the patent to suffice, and further apportionment is required "even when the accused product is the smallest salable unit...if the smallest salable unit is still a multi-component product encompassing non-patent related features." *Id.* For example, in *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2004), the Federal Circuit held that the fact that one feature of a computer program called "Outlook" infringed did not mean that the sale of Outlook could thus become the royalty base. Even though the multi-component Outlook program was the smallest salable unit in that case, "the use of a saleable unit greater than the patented feature is going to introduce *Uniloc* [EMVR] error when the patented feature is a 'date picker' [in the Outlook program], whether the saleable unit is a computer loaded with 'Outlook' or simply 'Outlook.'" *AVM Technologies, LLC v. Intel Corp*, 2013 WL 126233 at *3 (D. Del. 2013) (discussing *Lucent*, 580 F.3d at 1301). Similarly, allowing Rembrandt's expert to use as the royalty base the entire value of Timeline, News Feed, Groups, and Photo/Video Sharing—all of which can be used independently without infringing—while not using the value of BigPipe and Audience Symbol—the features that actually cause the alleged infringement—would be a mistake of the same kind as allowing Rembrandt's expert to use the entire value of Facebook.[18]

---

[18] *See also Riles v. Shell Exploration and Production Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) ("In the hypothetical negotiation...Shell may have non-infringing alternatives to [using the patented method]. The market could not award the patentee a royalty for his method divorced of all relation to a potential non-infringing alternative method. The economic relationship between the patented method and non-infringing alternative methods...would limit the hypothetical negotiation"); *Internet Machines, LLC v. Alienware Corporation*, 2013 WL 4056282 (E.D. Tex. 2013) (holding that switches were the smallest salable patent-practicing unit, because their use was the "smallest possible economically sound measure of damages" and there was evidence produced indicating that switch sales drove customer demand for the product); *Oracle*, 798 F.Supp.2d at 1115 (holding that, because a reasonable royalty can only be based on "the use

14

Accordingly, Mr. Malackowski's apportionment does not adequately represent what Facebook would have been willing to pay to license the patents at issue. As Rembrandt's own expert, Dr. Jennifer Golbeck, has admitted, without BigPipe and Audience Symbol, the four features used as the royalty base—Timeline, News Feed, Photo/Video Sharing, and Groups—do not infringe. In fact, those four features existed before the introduction of BigPipe and Audience Symbol in 2009, and continue to exist without infringing on Facebook's mobile platform. If Facebook did not pay Rembrandt to license the patents, it could have continued to use those four features without infringing. Thus, the claim that Facebook would pay, in a hypothetical negotiation, the entire revenue stream attributable to Timeline, News Feed, Photo/Video Sharing, and Groups runs contrary to what common sense indicates a reasonable licensor would pay for the patents at issue. Instead, Facebook would have paid the worth of the features actually causing the infringement—BigPipe and Audience Symbol.

Thus, Rembrandt's expert apportioned improperly when calculating a royalty base, and his expert testimony must be excluded on that basis alone. His testimony would be unreliable under *Daubert*, and allowing such inflated numbers before a jury would be prejudicial even if Facebook has the opportunity to cross-examine the expert about the royalty base.

Mr. Malackowski's improper apportionment based on those four features, furthermore, affects the calculation of a royalty rate. In calculating the royalty rate, Mr. Malackowski set the upper bound—that is, the most that Facebook would have been willing to pay for the license—by taking into account the results of the three market surveys above, stating that 21.99% represents the portion of Facebook's revenue attributable to the technologies at issue. Accordingly, because Mr. Malackowski uses the incorrect apportionment to determine not only the royalty base but

---

made of the invention by the infringer," the hypothetical license must be limited to the subset of a computer program that actually infringed, not the entire computer program).

15

also the royalty rate, both portions of his reasonable royalty analysis are unreliable. Nor is the flaw in Mr. Malackowski's expert opinion merely a dispute of fact; the flaw is in the nature of the analysis. By failing to use the portion of the revenue stream attributable to the infringing features, the entirety of his damages analysis is unreliable.

### C.

Next, Facebook claims Mr. Malackowski calculated the royalty base by using surveys that do not test for the importance of major features of Facebook.[19] Although the factual data underlying Mr. Malackowski's surveys may be incomplete, an expert's reliance upon some facts but not others is not always cause to exclude such testimony under *Daubert*. The Federal Circuit has noted that "[t]he existence of other facts...does not mean that the facts used failed to meet the minimum standards of relevance or reliability," and such testimony is not always excludable because "it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony." *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010). Thus, while the expert may have relied upon an incomplete list of facts in conducting his customer surveys, such matters could be brought to a jury's attention on cross-examination, and Mr. Malackowski's testimony is not excluded on this basis alone.

### D.

Furthermore, Facebook claims that the customer surveys used by Mr. Malackowski to calculate the royalty base are flawed because the surveys assume—without explanation—that the weighted importance of any given feature is exactly equal to that same percentage of advertising revenue. For example, Timeline received an average value of 4.0% compared with other

---

[19] The surveys did not test, for example, the importance of BigPipe or Audience Symbol, nor did they test for the importance of Facebook's global presence and number of users.

features surveyed, and Mr. Malackowski thus assumed that 4.0% of Facebook's revenue is generated by Timeline. In fact, one of Rembrandt's survey experts, Dr. Jerry Wind, admitted that his survey was just meant to determine the features that most drive Facebook's usage, and that "the link between this [usage] data and the revenue question has to be the subject of a separate analysis." Mr. Malackowski did not perform that analysis, and did not explain why weighted importance of some feature to a user directly correlates to a certain percentage of Facebook's advertising revenue. Accordingly, Mr. Malackowski's methodology is suspect and unreliable under Rule 702, Fed. R. Evid. and *Daubert*.

E.

Facebook claims that the expert's calculation of the royalty rate is unreliable because the lower bound (2.3%) of the royalty rate was calculated using two incomparable licenses.[20] Such a flaw concerns the factual underpinnings of Mr. Malackowski's methodology, not the methodology itself. The Federal Circuit has stated that "[t]he degree of comparability [between two license agreements] as well as any failure on the part of the expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). Accordingly, Mr. Malackowski's use of allegedly incomparable prior licenses to calculate a royalty rate is an issue for cross-examination, not an issue for exclusion under *Daubert*.

F.

---

[20] The prior licenses between Aduna—the original patent holder—and two other companies did not actually grant any rights with respect to the patents-in-suit; instead, both licenses gave rights to a complete and operational product and related services, not a patent. Furthermore, both licenses ended in failure.

17

Finally, Facebook argues the ultimate royalty rate chosen, 5-6%, is arbitrary. Mr. Malackowski explained the final rate of 5-6% by stating it was the product of "the totality of the information available to me under my *Georgia-Pacific* analysis." Although Mr. Malackowski did not give the exact numerical source of the final 5-6%, there is no indication that the methodology used by Mr. Malackowski in arriving at his final 5-6% royalty rate is unreliable. The expert applied the *Georgia-Pacific* factors to the upper and lower bounds of the royalty rate, articulating with particularity why each factor favored the licensor, the licensee, or neither, and thus why "the application of any one or all of those factors would permit an increase in the base royalty rate." *ePlus, Inc. v. Lawson Software, Inc.*, 764 F.Supp.2d 807, 815 (E.D. Va. 2011). Facebook does not contend that the *Georgia-Pacific* factors were applied incorrectly. Accordingly, any argument with Mr. Malackowski's final calculation of the royalty rate based on his application of the *Georgia-Pacific* factors is an issue of weight for cross-examination before the jury.

## IV.

In sum, Mr. Malackowski's expert report on damages is inadmissible under Rule 702 and the standards set forth in *Daubert* because the determination of both the royalty base and the royalty rate was flawed. Mr. Malackowski's report failed to apportion revenue to BigPipe and Audience Symbol, the features actually causing Facebook to allegedly infringe. Accordingly, Rembrandt's expert report claims more than the contribution of the claimed invention, and thus claims more damages than adequate to compensate for the alleged infringement. Accordingly, Mr. Malackowski's damages report must be excluded, and under Rule 26, Fed. R. Civ. P., Mr. Malackowski's testimony based on his damages report must also be excluded.

An appropriate order will issue.

Alexandria, Virginia
December 3, 2013

T. S. Ellis, III
United States District Judge

18