IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

REMBRANDT SOCIAL MEDIA, LP,

               Plaintiff

v.

FACEBOOK, INC.,

               Defendant.

CASE NO. 1:13-cv-00158-TSE/TRJ

**DEFENDANT FACEBOOK, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DECLARE THIS AN EXCEPTIONAL CASE AND FOR ATTORNEYS FEES AND EXPENSES PURSUANT TO 35 U.S.C. § 285**

**Table of Contents**

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    THE SUPREME COURT RECENTLY HELD THAT AN "EXCEPTIONAL CASE" IS SIMPLY ONE THAT STANDS OUT FROM THE OTHERS ...................... 2

III.   STATEMENT OF FACTS SUPPORTING EXCEPTIONAL CASE FINDING ............ 4

       A.     Rembrandt's Complaint and Publicity Blitz ........................................ 4

       B.     Rembrandt's Over-litigation of its Case .............................................. 5

       C.     Rembrandt's Excessive and Unreliable Damages Demands ................ 6

       D.     Rembrandt's Persistent Efforts to Assert Untimely and Unsupportable Damages Positions ........................................................ 8

       E.     Rembrandt's Overreach Extended to an Unnecessary Jury Trial ......... 9

IV.    ARGUMENT ...................................................................................................... 11

       A.     The Totality of the Circumstances Demonstrate That Rembrandt's Litigation Against Facebook is Exceptional Because "It Stands Out From The Others" ............................................................................... 11

       B.     The Principles of Compensation and Deterrence Demand That Rembrandt Reimburse Facebook for its Reasonable Attorneys' Fees and Costs .................... 14

V.     FACEBOOK'S REQUESTED FEES ....................................................................... 14

       A.     Application of the Johnson Factors ..................................................... 16

              1.     Factor 1: Time and Labor Required ......................................... 16

              2.     Factor 2: The Novelty and Difficulty of the Questions ........... 17

              3.     Factor 3: Skills Requisite to Properly Perform the Legal Service .......... 17

              4.     Factor 5: Customary Fees ........................................................ 17

              5.     Factor 7: Time Limitations Imposed by the Client or the Circumstances ........................................................................ 18

              6.     Factor 8: Amount Involved and the Results Obtained .............. 18

              7.     Factor 9: Experience, Reputation, and Ability of Attorneys .... 19

              8.     Factor 11: The Nature and Length of the Professional Relationship with the Client ...................................................... 19

              9.     Factor 12: Awards in Similar Cases ......................................... 19

       B.     Facebook is Also Entitled to Its Reasonable Non-Taxable Costs ....... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cent. Soya v. Geo A. Hormel & Co.*,
   723 F.2d 1573 (Fed. Cir. 1983) ............................................................................20

*Checkpoint Sys., Inc. v. All-Tag Security S.A.*,
   Case No. 01-cv-2223 (E.D. Pa. Oct. 2011) ............................................................20

*Comark Commc'ns Inc. v. Harris Corp.*,
   47 U.S.P.Q.2d 1469 (E.D. Pa. 1998) .....................................................................14

*eBay v. MercExchange, LLC*,
   547 U.S. 388 (2006) (Kennedy, J. concurring) .......................................................13

*Fogerty v. Fantasy, Inc.*
   510 U.S. 517 (1994) ..............................................................................................4

*Gabriel Techs. v. Qualcomm Inc.*,
   Case No. 3:08-cv-01992-AJB-MDD, 2013 WL 410103 (S.D. Cal. Feb. 1, 2013) .................20

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ............................................................................................15

*Highmark Inc. v. Allcare*,
   572 U.S.___, 134 S. Ct. 1744 (2014) ....................................................................3

*Johnson v. Georgia Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) .........................................................................15, 16

*Mathis v. Spears*,
   857 F.2d 749 (Fed. Cir. 1988) ..............................................................................14

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
   Case No. 08-4567 CW (N.D. Cal. May 3, 2012) ......................................................20

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. ___, 134 S. Ct. 1749 (2014) ........................................................... *passim*

*Oracle Am., Inc. v. Google, Inc.*,
   798 F. Supp. 2d 1111 (N.D. Cal. 2011) ..................................................................8

*Rucker v. Sheehy Alexandria, Inc.*,
  255 F. Supp. 2d 562 (E.D. Va. 2003) (Ellis, J.) ........................................................15

*Superior Form Builders v. Dan Chase Taxidermy Supply Co.*,
  881 F. Supp. 1021 (E.D. Va. 1994) .........................................................................20

*Synthon IP, Inc. v. Pfizer Inc.*,
  484 F. Supp. 2d 437 (E.D. Va. 2007) (Ellis, J.) ...............................................15, 20

*In re TCI Ltd.*,
  769 F.2d 441 (7th Cir. 1985) ...........................................................................13, 14

*Wheeler v. Durham City Bd. of Educ.*,
  585 F.2d 618 (4th Cir. 1978) .................................................................................20

**Statutes**

35 U.S.C. § 285 ................................................................................................3, 13, 14, 20

Copyright Act, 17 U.S.C. § 505 ..........................................................................................4

**Other Authorities**

Fed. R. Civ. P. 11 ...............................................................................................................14

Fed. R. Civ. P. 26 ...........................................................................................................8, 9

Fed. R. Civ. P. 54 ....................................................................................................2, 14, 15

Fed. R. Evid. 402 .................................................................................................................9

Fed. R. Evid. 403 .................................................................................................................9

## I.     Introduction

This action has been an "exceptional case" under the Supreme Court's recent decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. ___, 134 S. Ct. 1749 (2014). Asking for ████████████ in damages for a minor, unpatentable feature that Facebook did not even use stands out as a case that was overlitigated, fraught with over-reaching, and was unsupported throughout.  As such, Rembrandt Social Media, L.P. ("Rembrandt") should be ordered to pay the reasonable attorneys' fees and expenses incurred by Facebook Inc. ("Facebook") in defending this action.

After Facebook had become one of the great business success stories of the past decade and raised billions of dollars in its public offering, Rembrandt spotted an opportunity to take a piece of Facebook's success by inducing Aduna to sell it a couple of stale patents that had collected dust for nearly a decade.  Rembrandt then sought damages vastly out of proportion to the accused technology for one simple reason – any recovery it obtained would have to be divided among numerous other stakeholders, including Rembrandt's parent company, the failed Aduna entity, Aduna's U.S. lawyer (who was entitled to a finder's fee), and Rembrandt's outside counsel working on contingency fee basis. The early press releases by Rembrandt and its outside counsel touted the case as involving well-known features of Facebook such as "Like" and "Share."  Rembrandt dragged a tangential Virginia defendant, AddThis, into this case as a chess move to secure venue in this district.   (Facebook's motion to transfer having been denied, Rembrandt later settled with AddThis for a modest sum after Facebook's motion to transfer was denied.)  Rembrandt then abandoned its grand infringement allegations against Facebook and refocused its case on the minor BigPipe web page delivery technology and display of audience symbols.

Although the basis of Rembrandt's infringement case against Facebook changed during

this litigation, its desire for an astronomical payout did not.  Rembrandt ignored the actual

accused product in order to bolster an unsupportable damages figure.  Even after Rembrandt's

unreliable damages demands were stricken by this Court, Rembrandt persisted in asserting newly

spun, but never-disclosed damages theories, still in ███████████ that were factually and

legally unsupportable.

So while Facebook eventually emerged victorious at the jury trial, it nonetheless incurred

all of the burden, all of the expense, and all of the risk-laden uncertainty that faces any patent suit

defendant.  In this motion, Facebook asks the Court to shift some of that burden and expense to

Rembrandt.  Rembrandt's unreasonable positions and conduct make this litigation stand out from

the others and should result in an award of Facebook's reasonable attorneys' fees and costs.

## II.   The Supreme Court Recently Held that an "Exceptional Case" is Simply One that Stands Out From the Others

Federal Rule of Civil Procedure 54(d) authorizes a party to make a motion for a claim of

attorney's fees within 14 days after entry of the judgment.  *See* Fed. R. Civ. P. 54(d)(2).  The

motion must "specify the judgment and the statute, rule, or other grounds entitling the movant to

the award," and "state the amount sought or provide a fair estimate of it."  Fed. R. Civ. P.

54(d)(2)(B).  A district court "may decide issues of liability for fees before receiving submissions

on the value of services."  Fed. R. Civ. P. 54(d)(2)(C).  As explained in the Advisory Committee

Notes, "[t]he rule does not require that the motion be supported at the time of filing with the

evidentiary material bearing on the fees."  Fed. R. Civ. P. 54, Advisory Committee Notes to 1993

Amendment.  "What is required is the filing of a motion sufficient to alert the adversary and the

court that there is a claim for fees and the amount of such fees (or a fair estimate)."[1]  *Id.*

---

[1] At this stage, pursuant to Fed. R. Civ. P. 54(d)(2)(B), Facebook is providing the Court and Rembrandt a fair estimate of the Facebook's fees and non-taxable costs.  If the Court enters an

The patent statute provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  The Supreme Court's recent decision in *Octane Fitness* overruled the Federal Circuit's existing standard for showing an "exceptional case," stating that it is "unduly rigid, and it impermissibly encumbers the statutory grant of discretion to district courts."  *Octane Fitness*, 134 S. Ct. at 1755.  The Court held that "an 'exceptional case' is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Id*. at 1756.

The Court also held that a moving party may show an "exceptional case" by a preponderance of the evidence, overruling the Federal Circuit's previous requirement of clear and convincing evidence.  *Id.* at 1758.  The Supreme Court also held, in a companion case decided on the same day, that an award of attorneys' fees under Section 285 is reviewed for abuse of discretion.  *Highmark Inc. v. Allcare*, 572 U.S.___, 134 S. Ct. 1744, 1748-49 (2014).

The Supreme Court's decision in *Octane Fitness* reflected a clear shift from the stringent test of the Federal Circuit to a common sense, "totality of the circumstances" standard that allows district courts to exercise their discretion and experience in determining if a case is "exceptional."  *Octane Fitness*, 134 S. Ct. at 1756.  The Court observed that "[u]nder the standard announced today, a district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees."  *Id.* at 1756.  In directing courts to consider the totality of the circumstances, *Octane Fitness* pointed to the fee shifting provisions of the

---

order establishing Rembrandt's liability for attorneys' fees or would prefer to review the fees and non-taxable costs before deciding liability, Facebook will submit the documentation supporting the specific amount of fees and non-taxable costs as directed by the Court.

Copyright Act, 17 U.S.C. § 505, which consider a number of factors including "'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).

### III. Statement of Facts Supporting Exceptional Case Finding

#### A. Rembrandt's Complaint and Publicity Blitz

"Rembrandt Social Media," a holding company created in Virginia in late 2012 to bring this suit, filed its Complaint in February 2013. Rembrandt's lawsuit was brought without any notice or warning to Facebook. And while Facebook braced for millions of dollars in litigation costs and incalculable business disruption, for Rembrandt and its law firm, the filing of the surprise lawsuit was a time for celebration and publicity. Both Rembrandt and its law firm issued press releases trumpeting the litigation and the money they intended to seek from Facebook. (Ex. 1 to the Morton Declaration[2].) Rembrandt touted that the asserted patents "conceived of and patented core aspects of social media." (Ex. 2.) Rembrandt's lead trial counsel also took to the media, granting interviews claiming that Rembrandt's patents were "the beginnings of what we would say is social networking." (Ex. 3; *see also* Ex. 4.) Rembrandt encouraged the media to report that Rembrandt was seeking a royalty from Facebook on the well-known "Like" and "Share" functionality, not BigPipe—and understandably so, as the press would likely not have been interested in such a small and subsidiary feature.

Rembrandt's Complaint bore little similarity to the case that Rembrandt eventually tried to the jury, though its demand for astronomical damages never changed. The Complaint asserted that Facebook "bore a remarkable resemblance" to Mr. Van Der Meer's alleged inventions and

---

[2] Unless otherwise specified, all Exhibits referenced hereto are attached to the Declaration of Phillip E. Morton in Support of Facebook's Motion.

accused the so-called "Facebook Transfer Scripts" and "Facebook Transfer Applets" that allowed users to "like" and "share" information "like the Van Der Meer inventions." (D.I. 52, ¶¶ 18 and 22.) The allegedly infringing "like" and "share" functionality was critical to Rembrandt's efforts to secure venue in this district, as it gave Rembrandt a hook to sue AddThis, Inc. ("AddThis"), a small Northern Virginia company that offered tools for third party websites to add Like and Share features. (D.I. 52, ¶¶ 25-27.) Indeed, Rembrandt's counsel told the Court that AddThis was a critical component of Rembrandt's infringement theory, stating that AddThis is "equally involved in the infringement issue . . . [AddThis is] the maker of the system. [AddThis is] not a token." (Ex. 5 at 41-42.)

### B.       Rembrandt's Over-litigation of its Case

Rembrandt employed a scorched earth approach to this litigation from its inception, always treating it like ██████████. In its first round of infringement contentions, Rembrandt asserted all but five of the sixty-three claims in the patents-in-suit. Rembrandt persisted in asserting an excessive number of claims through *Markman* and most of fact discovery. Rembrandt was eventually forced by the Court to narrow its claims down to a more reasonable number. (D.I. 178.) After the Court had issued claim construction and discovery was largely complete, Rembrandt then conveniently dropped its claims against AddThis for a modest settlement amount ████████████████████ of what it would eventually demand from Facebook. (D.I. 471-1, Ex. 20 at 66.) Then, after months of discovery and millions of dollars spent litigating the accused "Like" and "Share" functionality, Rembrandt surprised Facebook on the day responsive expert reports were due by dropping all of the remaining claims directed at Facebook's "Like" and "Share," leaving only the BigPipe related claims that were never asserted against AddThis. (*See* Exs. 13-17.) To this day, Rembrandt has never explained why it dropped infringement claims against the features that it had initially touted as its core infringement

5

theory, and that served as the key driver for Rembrandt's efforts to keep this case in the Eastern District of Virginia.

Rembrandt's unreasonable litigation strategy extended to discovery as well.  Rembrandt demanded the production of millions upon millions of pages of documents, even though it candidly admitted to Facebook that it was not going to review them all. (D.I. 112-1, ¶ 13.) Facebook ultimately produced more than six million pages of documents, including nearly one million emails.  (Keefe Decl. ¶ 6(a).)  But Rembrandt did not enter into evidence a single one of the nearly one million emails it demanded that Facebook produce at a cost of hundreds of thousands of dollars.  Even on its lengthy trial exhibit list, Rembrandt proposed as exhibits only a handful of the six million pages of Facebook documents it had demanded.  (D.I. 290.)

Furthermore, Rembrandt demanded excessive deposition discovery, serving five 30(b)(6) notices with nearly seventy topics.  (Keefe Decl. ¶ 6(f).)  Ultimately, thirty-three depositions were taken in this matter, including fifteen depositions of Facebook 30(b)(6) and 30(b)(1) witnesses, Keefe Decl. ¶ 6(b), at a cost of hundreds of thousands of dollars and incalculable business disruption and lost productivity.  Many of these depositions pertained to functionalities that Rembrandt dropped from the case after the settlement of AddThis, and accordingly, were never used at trial.

###### C.     Rembrandt's Excessive and Unreliable Damages Demands

This was a big case for Rembrandt.  From the beginning, Rembrandt and its "partner" Aduna had their sights set on extracting a large sum of money from Facebook.  (*See* Ex. 2.) Indeed, Aduna's United States lawyer, Christian LaPointe, when approaching Rembrandt about the patents, expressed unbridled excitement about the prospects of a significant financial gain from the patents, ███████████████████████████████████ (Ex. 6 at 148:15 – 150:11 and Ex. 7.)  Aduna's belief that the patents ███████████████ was tied to the

6

"like" and "share" features dumped by Rembrandt after dropping AddThis from the suit for a token settlement. (*Id.*)  Notably, BigPipe was not identified as an important infringing feature.

Based on the deal Rembrandt struck with Aduna to purchase the patents, Rembrandt was obligated to divide up the proceeds in a number of ways.  First, Rembrandt's lawyers had to be paid ███████████████████████████████.  (Ex. 8 at 125:1-18.)  Then, Rembrandt had to pay ███████████████████████████████.  (*Id.* at 124:20-25.)  After that, Rembrandt was required to pay Aduna ███████████████ ████████████████████████████████████████████████ ████████████████████████████.  (Ex. 9 at R00077777.) Then finally, Mr. LaPointe, Aduna's attorney, retained for himself a right to ███████████ ███████ of the litigation paid to Aduna.  (*See* Ex. 6 at 25:21-26:17.)  After all of those payments were chipped away from any award, Rembrandt would be left with the remainder. Thus, in order for Rembrandt to profit from the arrangement, a very large damages award (or settlement) was necessary to justify its investment in the litigation.

Likely realizing that BigPipe was not significant enough to Facebook's revenue to support the ███████████ award Rembrandt required to make the litigation profitable, Rembrandt put forward a damages report from Mr. Malackowski with a single theory that unreasonably apportioned the damages base directed to features such as Timeline, News Feed, Groups and Photo/Video Sharing.  Notably, every one of the features in Mr. Malackowski's damages base had existed in some form on Facebook years before Rembrandt claimed that Facebook began infringing the patents through the use of BigPipe.  Indeed, Rembrandt's infringement expert candidly admitted that none of the features identified by Mr. Malackowski infringe on their own.  (D.I. 349 at 15.)  Mr. Malackowski made no attempt to apportion

damages to BigPipe.  Indeed, Mr. Malackowski scarcely even mentioned BigPipe in his report.

Because Mr. Malackowski's report was so unhinged from the facts of the case and was not

reflective of a legitimate reasonable royalty analysis, Facebook moved to exclude Mr.

Malackowski and his report under *Daubert*.  (D.I. 240.)

As the Court is well aware, it struck Mr. Malackowski's entire damages opinion under

*Daubert* on multiple grounds.  First, the Court found that Mr. Malackowski's failure to apportion

Facebook's revenue down to that which could reasonably be attributed to the new infringement

case (focused on BigPipe) was fatal to its damages theory.  (D.I. 349 at 12-13.)   The Court

found that Rembrandt's faulty apportionment "would award Rembrandt much more than 'the use

made of the invention by the infringer.'"  (D.I. 349 at 13 (*quoting Oracle Am., Inc. v. Google

Inc.*, 798 F. Supp. 2d 1111, 1115 (N.D. Cal. 2011).)   Likewise, the Court ruled that Mr.

Malackowski's apportionment was further flawed because he unreliably used weighted survey

data on the importance of features without performing any analysis to directly correlate it to

Facebook's advertising revenue.  (D.I. 349 at 17.)

> **D.**  **Rembrandt's Persistent Efforts to Assert Untimely and Unsupportable**
> **Damages Positions**

Undeterred by the Court's order striking its only damages theory and its failure to

disclose any other damages theory during discovery, Rembrandt preceded to fight tooth and nail

to get any evidence of damages it possibly could muster before the jury.  Indeed, Rembrandt

realized it had a fatal Rule 26 disclosure problem even before the Federal Circuit's decision on

Rembrandt's unsuccessful attempt to seek an interlocutory appeal.   In an attempt to cure its

failure to disclose any other damages theory, on January 31, 2014 Rembrandt served "Second

Supplemental Rule 26(a)(1)(A) Disclosures" with twelve pages of new and previously

undisclosed damages theories.  (*See* D.I. 387.)  Unsurprisingly, like Mr. Malackowski's stricken

report, Rembrandt's new theory again sought a similarly unreasonable ██████████ amount.

When the case returned to this Court, Rembrandt proceeded on an ambitious two-month campaign to force damages evidence into the case, though never actually coming forward with any reasonable demands.   Rembrandt even falsely accused Facebook of failing to produce documents about the purported value of BigPipe, only to learn that virtually the same documents were already produced in the six million page library of documents Rembrandt demanded be produced (but apparently did not review).  (*See* D.I. 383 at 10-11, D.I. 405 at 3-5.)  Overall, Facebook had to file eleven separate briefs, totaling hundreds of pages of briefing and thousands of pages of exhibits to beat back Rembrandt's repeated attempts to reverse this Court's rulings. (D.I. Nos. 379, 387, 405, 412, 413, 432, 438, 451, 463, 470 and 489.)  Rembrandt asserted no fewer than three new damages theories (which of course all demanded astronomical ██████ ██████), including a "per-user" theory that relied on unapportioned Aduna software (not patent) licenses.  The Court excluded those new theories as well.  (D.I. 435.)

Still somehow undeterred, Rembrandt then seized on an out of context statement from the recent *Apple v. Motorola* Federal Circuit decision to justify casting random facts at the jury untethered to any analysis and ask them to decide the amount of damages for themselves.  (D.I. 429.)  Rembrandt admitted it had <u>no</u> theory of damages and would not present one to the jury. Instead, Rembrandt obliquely proffered that it would offer the jury undisclosed "facts".  After several rounds of briefing, the Court ended Rembrandt's sideshow, striking all of Rembrandt's new damages facts on Fed. R. Civ. P. 26 and Fed. R. Evid. 402/403 grounds, excluding any evidence of damages from trial.  (Ex. 10 at 22-36.)

### E.   Rembrandt's Overreach Extended to an Unnecessary Jury Trial

Given that all evidence of damages was excluded and the potential for a permanent injunction was essentially non-existent, a reasonable litigant would have stipulated to judgment and taken the damages issues up to the Federal Circuit for appeal rather than fight a quixotic trial on infringement and validity.  Rembrandt instead continued to overreach, pressing forward with the jury trial even though it never clearly articulated why it was forcing the parties to collectively spend more than a million dollars trying a liability case with no apparent remedy.

While this lawsuit began with great fanfare, Rembrandt's rhetoric in the complaint and its initial publicity blitz did not even remotely reflect the case that it tried to the jury.  Of course, nothing was said about the abandoned "Like" and "Share" functionality that Rembrandt claimed were central at the beginning of the case.  The two Aduna background witnesses offered no testimony relevant to any issue.  Instead, they served as props hung out by Rembrandt to make a sympathy play about the long deceased inventor.  And not surprisingly, no one took the stand to represent Rembrandt.

On the merits, Rembrandt's case fared no better.  Rembrandt attempted to stir the jury with its opening statement by invoking Thomas Jefferson and the Constitution, and suggesting that the asserted patents were as monumental as the inventions of Thomas Edison and the Wright Brothers.  Then Rembrandt's infringement case collapsed as Rembrandt's expert casually admitted away Rembrandt's entire infringement case on cross-examination.

Rembrandt also suggested to the jury in opening statements that Mr. van Der Meer had invented four different significant things -- advertising on the Internet, diary pages, website privacy controls, and finally, the "diary program" that was recited in the claims.  But by the time Rembrandt's expert returned to the stand in an attempt to rebut Facebook's invalidity expert, the only part of the invention she argued was not in the prior art was the "diary program."

Moreover, in closing argument Rembrandt never disputed that Mr. Van der Meer did not invent Internet advertising, diary pages or privacy controls.

In the end, Rembrandt's unnecessary jury trial resulted in the right verdict in favor of Facebook, but getting to that resolution cost Facebook millions of dollars and incalculable disruption to its business and personnel.

## IV.   Argument

### A.   The Totality of the Circumstances Demonstrate That Rembrandt's Litigation Against Facebook is Exceptional Because "It Stands Out From The Others"

The totality of the circumstances support the conclusion that Rembrandt's lawsuit against Facebook is "exceptional" because it "stands out from the others." From the celebratory press releases to Rembrandt's litigation conduct through trial, it is clear that Rembrandt's "motivation" was to harass Facebook with a burdensome and expensive litigation seeking ████████ ████ payout, based on minor features of Facebook which did not infringe two invalid patents.  To pay off all of the stakeholders in this litigation and still retain a profit for itself, Rembrandt needed to make a significant amount of money.  Accordingly, Rembrandt's motivation in this litigation was to do everything possible to apply maximum burden to pressure Facebook to pay Rembrandt an enormous settlement, or if not, convince a jury to award ████ ████████ award based on the use of the minor features of BigPipe and Audience Symbols.

Rembrandt candidly admitted that it brought suit in this district because of the speed of the docket, (Ex. 5 at 41:25-42:2) ("we think that it's appropriate that we have the opportunity to get the benefit of the fast track."), presumably with the motivation and expectation that the speed and expense of litigating here would wear down Facebook and its resolve to fight the litigation. To secure venue in this district, Rembrandt sued the tangential Virginia defendant AddThis, arguing to this Court that AddThis was critical to Rembrandt's infringement theory, that it was

"equally involved in the infringement issue", "the maker of the system" and "not a token." (*Id.* at 42:3-7.)   Conveniently, it turned out that once the Court had construed the claims and discovery was nearly complete, Rembrandt lost its motivation to continue the litigation against "the maker of the system" accused of infringement, casting AddThis and the related infringement allegations against the "Like" and "Share" functionality aside for a nuisance monetary settlement.

Relying on the speed of this Court's docket, Rembrandt attempted to bury Facebook under a blizzard of asserted claims and unnecessary discovery.  Rembrandt asserted nearly every claim in the two patents-in-suit, requiring Facebook to defend against nearly 60 different patent claims and develop invalidity and non-infringement defenses for every single claim.  Only after being ordered by the Court did Rembrandt finally begin to narrow its case.  And then only after AddThis exited the litigation did Rembrandt toss aside the "Like" and "Share" functionality it claimed was central to the litigation, narrowing the case to BigPipe. Rembrandt also unashamedly tried to drive up Facebook's discovery costs, all the while admitting that it would never even review most of the documents it was demanding.   In response to Rembrandt's excessive demands, Facebook was required to produce over six million pages of documents, including nearly one million emails that ended up being of so little consequence Rembrandt did not admit a single one at the trial of this action.

The centerpiece, though, of "exceptionality" came with Rembrandt's properly excluded damages case, which Rembrandt forced the Court and Facebook to litigate for more than eight months.  Rembrandt's repeated ███████████ demands exemplify greed writ large.  None of Rembrandt's astronomical demands were tethered to the facts or the actual value of BigPipe to Facebook.  Instead, they were driven by Rembrandt's need to score a monetary "treasure chest"

to bankroll this and other NPE litigation.  And even after the Court disposed of every one of Rembrandt's damages arguments, Rembrandt refused to relent taking the case to a jury trial even though it had no ability to seek monetary damages and no realistic prospect of a permanent injunction.[3]

As the Court and the parties both know, lawsuits are easy to file, but expensive to defend. "Litigation gives lawyers opportunities to impose on their adversaries costs much greater than they impose on their own clients. The greater the disparity, the more the litigation becomes a predatory instrument rather than a method of resolving honest disputes." *In re TCI Ltd.*, 769 F.2d 441, 446 (7th Cir. 1985).  As discussed above, Rembrandt's actions caused Facebook to expend millions of dollars defending itself and imposed incalculable costs on its business operations and lost productivity.

Rembrandt, on the other hand, was represented by contingency lawyers and has no meaningful business operations to disrupt.  Its discovery obligations were minimal considering its status as little more than a holding company for the patents-in-suit.  The discovery and other burdens associated with this litigation, in other words, were wildly asymmetric.   The unreasonable manner in which Rembrandt litigated this case, combined with its pecuniary interest motivating the maximization of litigation costs on Facebook, makes this a case that "stands out from others" under Section 285.  *Octane Fitness*, 134 S. Ct. at 1756.

---

[3] *See eBay v. MercExchange, LLC*, 547 U.S. 388, 396-97 (2006) (Kennedy, J. concurring) ("An industry has developed in which firms use patents not as a basis for producing and selling goods but, instead, primarily for obtaining licensing fees . . . For these firms, an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent . . . When the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest." (internal citations omitted)).

**B.      The Principles of Compensation and Deterrence Demand That Rembrandt Reimburse Facebook for its Reasonable Attorneys' Fees and Costs**

The principles of compensation and deterrence expressed by the Supreme Court in *Octane Fitness* weigh in favor of awarding Facebook it reasonable attorneys' fees and costs. Indeed, one of the purposes of Section 285, like similar provisions such as Fed. R. Civ. P. 11, is to "bring costs home to those who create them." *In re TCI Ltd.*, 769 F.2d at 446; *see also Mathis v. Spear*s, 857 F.2d 749, 754 (Fed. Cir. 1988).  The exceptional nature of Rembrandt's persistent demands for large amounts, regardless of the facts and the limited importance of the accused BigPipe feature, as well as Facebook's complete victories on non-infringement and invalidity before the jury, justify a compensatory award of Facebook's reasonable attorneys' fees and costs.

An award of fees and costs would also deter Rembrandt and other non-practicing entities from taking unreasonable positions, including damages theories that seek astronomical damages having no relationship to the actual contribution of the patented invention.  When appropriate–as here–courts award substantial fees to reimburse the actual loss a defendant incurs to deter the kind of overreaching that occurred in this case. *See, e.g., Mathis*, 857 F.2d at 754; *see also Comark Commc'ns Inc. v. Harris Corp.*, 47 U.S.P.Q.2d 1469 (E.D. Pa. 1998) (awarding $3,025,859.39 in attorneys' fees and expenses under 35 U.S.C. § 285).  Non-practicing entities such as Rembrandt will only be deterred from unreasonable litigation when the consequences of their actions hit their pocketbook.

## V.    FACEBOOK'S REQUESTED FEES

A fair estimate of the reasonable attorney's fees sought by Facebook in this matter is approximately ▮▮▮▮▮▮ and a fair estimate of Facebook's non-taxable costs incurred is ▮▮▮▮▮▮ Fed. R. Civ. P. 54(d)(2)(B)(iii) (permitting a party to provide a "fair estimate" of the amount sought in a motion for attorney's fees); *see also* Advisory Committee Note on 1993 Am.

to Fed. R. Civ. P. 54 ("The rule does not require that the motion be supported at the time of filing with the evidentiary material bearing on the fees."). Facebook is ready to supply the Court with detailed additional information, including detailed invoices and billing records, to support its request for fees should the Court request such information or should the Court grant Facebook's motion declaring this case exceptional.

Facebook, as the party seeking attorney's fees, bears the burden of demonstrating the reasonableness of its requested fee amount. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," commonly referred to as the lodestar amount. *Id.*; *see Synthon IP, Inc. v. Pfizer Inc.*, 484 F. Supp. 2d 437, 443 (E.D. Va. 2007) (Ellis, J.). The Court's determination of reasonableness is also informed by other considerations, including twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) ("*Johnson* factors"). *Synthon IP*, 484 F. Supp. 2d at 443-44 (citing *Hensley*, 461 U.S. at 434 (internal citations omitted)).

The twelve *Johnson* factors are:

> (1)[t]he time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to properly perform the legal service; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fees; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*See Rucker v. Sheehy Alexandria, Inc.*, 255 F. Supp. 2d 562, 565 n. 4 (E.D. Va. 2003) (Ellis, J.) (citing *Johnson*, 488 F.2d at 717-19). The Court may adjust the fee upward or downward as necessary based on these factors and other discretionary reasons. *Synthon IP*, 484 F. Supp. 2d at

15

444. Here, Factors 1-3, 5, 7-9, and 11-12 are relevant to this case, and all clearly support the reasonableness of Facebook's application for fees.

### A. Application of the *Johnson* Factors[4]

#### 1. *Factor 1: Time and Labor Required*

This case was a massive undertaking due, in great part, to Rembrandt's consistent overreaching. Rembrandt asserted 58 out of 63 patent claims in its initial infringement contentions, encompassing as many as five distinct direct infringement scenarios, as well as numerous indirect and joint infringement scenarios. Rembrandt's overly broad document requests and email search terms resulted in the production of more than 1.2 million documents by Facebook that totaled more than 6 million pages. (Keefe Decl. ¶ 6(a).) Rembrandt served five separate substantive 30(b)(6) notices, encompassing 69 topics, many with discrete subparts. (Keefe Decl. ¶ 6(f).) These notices, as well as two additional personal deposition notices, resulted in fifteen depositions of Facebook witnesses. In all, the parties took thirty-three fact and witness depositions (not including any depositions of AddThis witnesses). (Keefe Decl. ¶ 6(b).)

This case also involved significant amounts of motion practice and numerous hearings. Not including motions and hearings relating solely to AddThis, there were more than twenty motions filed, several with supplemental briefing ordered, and fifteen pre-trial conferences and hearings held on these motions and other case-related issues. (*See generally* Docket.) The jury trial in this action lasted four days.

As a result of this broad litigation landscape, Facebook's lawyers at Cooley LLP billed more than 9,000 hours from the filing of the Complaint on February 4, 2013 through the close of

---

[4] Certain of the *Johnson* factors address the specific fees and non-taxable costs requested. As noted previously, Facebook is providing a fair estimate of its fees and non-taxable costs in this brief and will provide documentation supporting it and related analysis of the *Johnson* factors as directed by the Court.

trial on June 13, 2014.   (Keefe Decl. ¶ 8.) This was reasonable and appropriate given the circumstances of this litigation.

### 2.      *Factor 2: The Novelty and Difficulty of the Questions*

As is not surprising in a patent case, this case involved numerous difficult and complex issues.  The technology underlying the accused features, including both the BigPipe technology discussed extensively at trial and the technology underlying those infringement claims dropped by Rembrandt during the litigation, was complex, and required both parties to retain technical experts to assist with their understanding of the technology.  The same is true for the prior art references and systems Facebook identified as part of its invalidity defense, which again required both parties to retain technical experts.

In addition, Rembrandt sought nearly ███████████ in past damages through December 2013, basing its request on five separate expert reports, including three surveys.  In order to properly respond to Rembrandt's complex and behemoth damages claim, Facebook retained four experts to conduct two additional surveys and rebut each of Rembrandt's reports.  These complex damages-related issues added to the complexity of this case.

### 3.      *Factor 3:  Skills Requisite to Properly Perform the Legal Service*

In this matter, the skill required to properly perform the legal services include civil litigation, federal court practice, and patent litigation expertise and experience.  Facebook's counsel had this expertise and experience.  (*See* Morton Decl., Ex. 11.)

### 4.      *Factor 5:  Customary Fees*

The fees sought by Facebook are reasonable in light of the fees charged for other similar patent lawsuits.  According to the 2013 AIPLA Report of the Economic Survey, prepared by the American Intellectual Property Law Association, typical litigation costs through trial for all types of patent infringement litigation with more than $25 million at risk in the Washington, D.C. area

██████████████████████████████████████████████████ (Ex. 12.)
For cases involving the defense against an assertion of a patent by a non-practicing entity, typical litigation costs through trial for cases with more than $25 million at risk in the Washington, D.C. area ████████████████████████████████████████████████████████

█████████ (*Id.*)  Here, where ████████████████ was at stake, it is not unreasonable that Facebook would incur approximately $5.8 million in fees, and these fees are consistent with the average cost of patent litigation of this magnitude.

### 5.      Factor 7: Time Limitations Imposed by the Client or the Circumstances

Rembrandt brought this case in this district, which is known for its short time to trial. Rembrandt went so far as to join in an unnecessary co-defendant resident of Virginia, AddThis, who it settled out for a nuisance settlement prior to the service of opening expert reports.  By filing here, Rembrandt imposed significant burdens on Facebook's counsel and employees due to the fast paced schedule in which invalidity contentions, claim construction, and fact discovery were all completed within six months of the filing of Rembrandt's Complaint.

### 6.      Factor 8:  Amount Involved and the Results Obtained

As this Court is well aware, Rembrandt sought nearly ████████████████ in past damages from Facebook initially, and continued to seek similarly large sums of damages in its repeated attempts to "do over" its damages case.  Rembrandt also sought an injunction or, in the alternative, ongoing royalties, likely at a similarly astronomical level.  (*See* Compl. at 19-21.) The high stakes of this litigation more than adequately justify the fees incurred by Facebook.

Facebook also prevailed on every jury issue, as well as pre-trial rulings affecting the merits of Rembrandt's damages case.  The jury found that Facebook did not infringe any asserted claim and that all asserted claims were invalid.  Moreover, Rembrandt was prevented from offering any evidence of past damages at trial due to pre-trial rulings on which Facebook

prevailed, including Facebook's successful *Daubert* challenge of Rembrandt's damages expert and successful motions *in limine*.  These successes also justify the costs and fees incurred by Facebook.

### 7.    *Factor 9: Experience, Reputation, and Ability of Attorneys*

Facebook's attorneys have substantial patent litigation experience and trial experience. For example, Facebook's lead attorneys, Michael Rhodes and Heidi Keefe, have a great depth and breadth of relevant experience, and have each received numerous accolades for their intellectual property, patent, and litigation expertise, both in California and nationwide.  (*See* Morton Decl., Ex. 11.)  The other attorneys and paralegals also have significant patent and civil litigation experience.  (*Id.*)

### 8.    *Factor 11:  The Nature and Length of the Professional Relationship with the Client*

The team of Heidi Keefe and Mark Weinstein were first retained by Facebook in 2007, when they represented Facebook in its first patent litigation, *Cross Atlantic Capital Partners v. Facebook*, in the Eastern District of Pennsylvania.  Since that time, Ms. Keefe, Mr. Weinstein, and Mr. Rhodes, have represented Facebook in dozens of patent cases across the country, including Facebook's first jury trial in the District of Delaware in 2010.  (*See* Keefe Decl. ¶10.) Facebook has been a client of Cooley since 2007, and Cooley has also handled a wide variety of non-patent matters for Facebook since that time, including numerous privacy class action litigations and trademark matters.  (*See* Keefe Decl. ¶ 11.)  Along with these three partners, multiple members of the Cooley team who supported this case have institutional knowledge gained from work on other Facebook matters, leading to increased efficiencies and additional justification for hiring these particular lawyers.

### 9.    *Factor 12:  Awards in Similar Cases*

Facebook's requested attorney fees and costs are comparable to fee awards in other patent cases.  *See, e.g.*, *Gabriel Techs. v. Qualcomm Inc.*, Case No. 3:08-cv-01992-AJB-MDD, 2013 WL 410103 (S.D. Cal. Feb. 1, 2013) (granting $12.4 million in attorneys' fees and costs to defendant); *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, Case No. 08-4567 CW (N.D. Cal. May 3, 2012) (awarding approximately $8.4 million in attorney's fees and $660,000 in non-taxable costs to declaratory judgment plaintiff); *Checkpoint Sys., Inc. v. All-Tag Security S.A.*, Case No. 01-cv-2223 (E.D. Pa. Oct. 2011) (awarding approximately $2.43 million and $4.15 million in attorneys' fees and costs to two respective defendants).

### B.   Facebook is Also Entitled to Its Reasonable Non-Taxable Costs

In addition to its fees discussed above, Facebook also seeks approximately ███ in nontaxable expenses incurred in this litigation.  The requested costs include: (1) attorney and staff travel and hotel expenses; (2) copying costs for trial exhibits; (3) necessary demonstrative costs; (4) non-taxable electronic discovery related costs, including the cost of contract attorneys;[5] (5) legal research; and (6) any costs not awarded as taxable in Facebook's Bill of Costs.

Non-taxable costs are recoverable in exceptional cases where attorney's fees are awarded.  *See Synthon IP*, 484 F. Supp. 2d at 445 (granting a percentage of costs for travel, demonstratives, copying, and legal research among others); *Cent. Soya v. Geo A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983) (non-taxable costs are recoverable under 35 U.S.C. § 285); *Superior Form Builders v. Dan Chase Taxidermy Supply Co.*, 881 F. Supp. 1021, 1029 (E.D. Va. 1994) (citing *Wheeler v. Durham City Bd. of Educ.*, 585 F.2d 618, 623 (4th Cir. 1978)) ("litigation expenses" are compensable in determining an award of attorney's fees).

---

[5] A recent decision found fees of contract reviewers with substantially lower billing rates than associates at a large law firm to be reasonable and compensable with an award of attorney's fees. *See, e.g.*, *Gabriel Techs.*, 2013 WL 410103, at *9-10 (granting contract attorney fees for document review).

Dated: June 27, 2014

Respectfully submitted,

By:   */s/ Phillip E. Morton*

      Jonathan G. Graves (VSB No. 46136)
      Phillip E. Morton (VSB No. 71299)
      COOLEY LLP
      11951 Freedom Drive
      Reston, VA  20190
      Telephone:  703-456-8000
      Facsimile:   703-456-8100
      jgraves@cooley.com
      pmorton@cooley.com

Michael G. Rhodes (Admitted *pro hac vice*)
Heidi Keefe (Admitted *pro hac vice* )
Mark Weinstein (Admitted *pro hac vice*)
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
Telephone:  (650) 843-5000
Facsimile:   (650) 857-0663
rhodesmg@cooley.com
hkeefe@cooley.com
mweinstein@cooley.com

Attorneys for Defendant Facebook, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of June, 2014, I will electronically file the foregoing DEFENDANT FACEBOOK, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DECLARE THIS AN EXCEPTIONAL CASE AND FOR ATTORNEY FEES AND EXPENSES PURSUANT TO 35 U.S.C. § 285 with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Ahmed J. Davis
Daniel Gopenko
FISH & RICHARDSON P.C.
1425 K Street N.W. 11th Floor
Washington, D.C. 2005
Telephone:  (202) 783-5070
Facsimile:  (202) 783-2231
*Counsel for Plaintiff Rembrandt Social Media, LP*


*/s/ Phillip E. Morton*

Phillip E. Morton (VSB No. 71299)
Cooley LLP
11951 Freedom Drive
Reston, VA  20190
Telephone:  703-456-8000
Facsimile:   703-456-8100
pmorton@cooley.com

Attorneys for Defendant Facebook, Inc.